Che Corrington, OSB No. 216151
Email: che@hattislaw.com
Daniel M. Hattis (*pro hac vice* to be submitted)
Email: dan@hattislaw.com
HATTIS & LUKACS
11711 SE 8ᵗʰ St, Suite 120
Bellevue, WA 98005
Telephone: (425) 233-8650

Stephen P. DeNittis (*pro hac vice* to be submitted)
Email: sdenittis@denittislaw.com
DENITTIS OSEFCHEN PRINCE, P.C.
5 Greentree Centre, Suite 410
525 Route 73 N.
Marlton, New Jersey 08057
Telephone: (856) 797-9951

*Attorneys for Plaintiffs
and the Proposed Class*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| KARA KIRKPATRICK, GILLIAN MAXFIELD, ANNA DEMARCO, and CODY MICHAEL, for themselves and on behalf of all others similarly situated, | Case No. 3:24-cv-00955 |
| | |
| Plaintiffs, | **CLASS ACTION COMPLAINT FOR:** |
| | |
| v. | **(1) VIOLATION OF THE UNLAWFUL TRADE PRACTICES ACT, ORS 646.605 *et seq.*** |
| | |
| | **(2) BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING (PLEADED IN THE ALTERNATIVE)** |
| SIRIUS XM RADIO INC., | |
| | DEMAND FOR JURY TRIAL |
| Defendant. | |

CLASS ACTION COMPLAINT

Plaintiffs Kara Kirkpatrick, Gillian Maxfield, Anna DeMarco, and Cody Michael, individually and on behalf of all others similarly situated, allege as follows, on personal knowledge and investigation of their counsel, against Defendant Sirius XM Radio Inc. ("Sirius XM" or "Defendant"):

## I.  <u>INTRODUCTION AND SUMMARY</u>

1.     Plaintiffs Kara Kirkpatrick, Gillian Maxfield, Anna DeMarco, and Cody Michael bring this action under Oregon law on behalf of a class of Oregon Sirius XM subscribers to challenge a deceptive pricing scheme whereby Sirius XM falsely advertises its music plans at lower prices than it actually charges. Sirius XM fails to include in its advertised prices the amount of its invented "U.S. Music Royalty Fee," which increases the true plan price by 21.4% above the advertised price for the plans.[1]

2.     Sirius XM intentionally does not disclose the Fee to its Oregon subscribers. Sirius XM even goes so far as to not mention the words "U.S. Music Royalty Fee" in <u>any</u> of its advertising, including in the fine print. Sirius XM's sole advertising disclaimer is that "Fees and taxes apply"—but in reality zero taxes and zero other fees apply, such that the undisclosed U.S. Music Royalty Fee is the sole and exclusive component of "Fees and Taxes."

3.     Once consumers have been lured to sign up, Sirius XM prevents them from learning about its scheme by never thereafter sending them monthly or ongoing billing notices or invoices. All the while, Sirius XM silently and automatically renews their subscriptions month after month and year after year. And, as the price of its subscribers' music plans increase—e.g.,

---

[1] The rate for the U.S. Music Royalty Fee is 21.4% for Sirius XM's <u>satellite radio</u> music plans (which comprise the overwhelming majority of Sirius XM subscriptions), and 8.8% for Sirius XM's <u>streaming-only</u> music plans (which are internet-only and do not require a satellite radio, and which comprise a tiny minority of Sirius XM subscriptions).

**HATTIS & LUKACS**
11711 SE 8th St, Ste 120
Bellevue, WA 98005
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

when a promotional rate expires—the U.S. Music Royalty Fee amount, being a flat 21.4% charge, also increases.

4.      Notably, none of Sirius XM's competitors charge any separate royalty fee over and above their advertised music plan prices. Sirius XM knows that reasonable consumers would not expect Sirius XM to charge the U.S. Music Royalty Fee, let alone call it "Fees and Taxes."

5.      Even the name of the U.S. Music Royalty Fee is deceptive. Sirius XM calls it a "U.S." fee to falsely indicate to consumers (i.e., to those few consumers who learn about its existence) that it is a government-related fee.

6.      In the event that a subscriber happens to notice the U.S. Music Royalty Fee has been charged and then contacts Sirius XM to inquire about the Fee, Sirius XM has a policy and practice of outright falsely telling the subscriber that it is "government mandated" or is a government pass-through fee.

7.      Sirius XM's U.S. Music Royalty Fee scheme has been the source of all of Sirius XM's profits for the past several years. For example, in 2023, Sirius XM collected $1.36 billion in U.S. Music Royalty Fee charges, while the entire company had net profits of $1.26 billion. In other words, in 2023, U.S. Music Royalty Fee revenues were equal to 108% of the net profits for the entire company.[2]

8.      Sirius XM falsely advertised the prices of its music plans to Plaintiffs and Class members, and Sirius XM never adequately disclosed to them that the U.S. Music Royalty Fee would be charged or its true nature. Meanwhile, Sirius XM's sign-up process, automatic renewal

---

[2] In 2023, Sirius XM had subscriber revenues from its SiriusXM-branded service of $6.34 billion, approximately 21.4% of which (i.e., $1.36 billion) were payments of the U.S. Music Royalty Fee. See 2023 10-K of Sirius XM Holdings Inc., pp. F-5, F-39, available at https://investor.siriusxm.com/sec-filings/all-sec-filings/content/0000908937-24-000008/0000908937-24-000008.pdf.

HATTIS & LUKACS
11711 SE 8th St, Ste 120
Bellevue, WA 98005
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

process, and policy of not sending monthly or ongoing billing notices or invoices are deliberately designed to prevent subscribers from learning of the U.S. Music Royalty Fee.

9.      Sirius XM automatically charges the U.S. Music Royalty Fee to nearly all of its 431,000[3] Oregon subscribers (the Fee currently accounts for over $17 million in annual charges to Oregon subscribers alone). Since Sirius XM invented and introduced the Fee in 2009, Plaintiffs estimate that Sirius XM has unlawfully extracted over $130 million from Oregon consumers in U.S. Music Royalty Fee charges.

10.     Plaintiffs Kara Kirkpatrick, Gillian Maxfield, Anna DeMarco, and Cody Michael bring this lawsuit individually and on behalf of a Class of current and former Sirius XM subscribers in Oregon who paid a U.S. Music Royalty Fee. Plaintiffs seek, among other things, statutory damages under the Oregon Unlawful Trade Practices Act of $200 per class member or actual damages, whichever is greater. In the alternative, Plaintiffs seek damages for breach of the implied covenant of good faith and fair dealing to Plaintiffs and Class members in the amount they paid in U.S. Music Royalty Fees. Plaintiffs also seek an order for public injunctive relief, enjoining Sirius XM from engaging in the unlawful conduct alleged herein.

11.     To be clear, Plaintiffs are <u>not</u> seeking to regulate the existence or amount of the U.S. Music Royalty Fee (although Plaintiffs contend that the name of the Fee is deceptive because Sirius XM intentionally calls it a "U.S." fee to trick consumers into thinking it is a government-related fee). Rather, Plaintiffs want Sirius XM to include the <u>amount</u> of the so-called U.S. Music Royalty Fee in the music plan prices it advertises to the general public, and to adequately disclose the Fee and its true nature and basis.

---

[3] Plaintiffs estimate that Sirius XM has approximately 431,000 music plan subscribers in Oregon, which would comprise 1.27% of Sirius XM's 33.9 million subscribers (Oregon represents 1.27% of the U.S. population).

**HATTIS & LUKACS**
11711 SE 8th St, Ste 120
Bellevue, WA 98005
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

II.    **THE PARTIES**

12.    Plaintiff Kara Kirkpatrick is, and at all relevant times has been, a citizen and resident of the city of Portland, in Multnomah County, Oregon.

13.    Plaintiff Gillian Maxfield was at all relevant times a citizen and resident of the city of Portland, in Multnomah County, Oregon.

14.    Plaintiff Anna DeMarco is, and at all relevant times has been, a citizen and resident of the city of Marcola, in Lane County, Oregon.

15.    Plaintiff Cody Michael is, and at all relevant times has been, a citizen and resident of the city of Salem, in Marion County, Oregon.

16.    Defendant Sirius XM Radio Inc. ("Sirius XM") is a corporation chartered under the laws of Delaware, with its principal place of business in New York.

III.    **JURISDICTION AND VENUE**

17.    **Subject Matter Jurisdiction.** This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2) because the amount in controversy, exclusive of interest and costs, exceeds $5,000,000, and this is a proposed class action in which there are members of the proposed Class who are citizens of a state different from the Defendant.

18.    **Personal Jurisdiction.** This Court has personal jurisdiction over Sirius XM because, without limitation: (1) Sirius XM is authorized to do business and regularly conducts business in the Oregon; (2) the claims alleged herein took place in Oregon; and/or (3) Sirius XM has committed tortious acts within Oregon (as alleged, without limitation, throughout this Complaint). Sirius XM has sufficient minimum contacts with Oregon to render the exercise of jurisdiction by this Court permissible.

**HATTIS & LUKACS**
11711 SE 8th St, Ste 120
Bellevue, WA 98005
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

19.     **Venue.** Venue is proper pursuant to 28 U.S.C. §1391 because Plaintiffs Kara Kirkpatrick, Anna DeMarco, and Cody Michael are Oregon citizens who reside in this District (specifically, in the city of Portland, which is in Multnomah County, Oregon, in the city of Marcola, which is in Lane County, Oregon, and in the city of Salem, which is in Marion County, Oregon, respectively). Ms. Kirkpatrick purchased her Sirius XM music plan in Portland, Oregon for use in her automobile, which she drove in and around her home in Portland, Oregon. Ms. DeMarco purchased Sirius XM music plans in Marcola, Oregon for use in her automobile, which she drives in and around her home in Marcola, Oregon. Mr. Michael purchased his Sirius XM music plans in Salem, Oregon for use in his automobile, which he drove in and around his home in Salem, Oregon

20.     **Divisional Venue.** The Portland Division is the proper divisional venue under LR 3-2(b). Plaintiff Kara Kirkpatrick resides in Lane County, which is part of the Portland Division. Also, a substantial part of the events or omissions giving rise to the claim occurred in the Portland Division, including without limitation, Ms. Kirkpatrick purchased her Sirius XM music plan in Portland, Oregon for use in her automobile, which she drove in and around her home in Portland, Oregon, and Plaintiff Gillian Maxfield purchased her Sirius XM music plan in Portland, Oregon for use in her automobile, which she drove in and around her home in Portland, Oregon.

## IV.    FACTUAL ALLEGATIONS OF SIRIUS XM'S DECEPTIVE PRICING SCHEME

21.     Defendant provides Sirius XM-branded satellite radio and internet-only streaming plans to approximately 33.9 million consumers nationwide[4], including approximately 431,000

---

[4] *See* 2023 10-K of Sirius XM Holdings Inc., p. 5, available at https://investor.siriusxm.com/sec-filings/all-sec-filings/content/0000908937-24-000008/0000908937-24-000008.pdf.

CLASS ACTION COMPLAINT                    - 5 -

Oregonians. Nearly all of the service plans offered by Sirius XM include music channels ("music plans").

22.     Sirius XM falsely advertises its music plans at lower rates than it actually charges by not including in the advertised price the amount of its invented "U.S. Music Royalty Fee." Sirius XM intentionally does not disclose the extra charge. Sirius XM even goes so far as to not mention the words "U.S. Music Royalty Fee" in any of its advertising, including in the fine print. Once consumers have been lured to sign up, Sirius XM prevents them from learning about its scheme by never thereafter sending them monthly or ongoing billing notices or invoices. All the while, Sirius silently and automatically renews their subscriptions month after month and year after year.

23.     Sirius XM imposes the U.S. Music Royalty Fee on all subscribers of its satellite radio music plans (satellite radio subscribers comprise the overwhelming majority of Sirius XM subscribers), at a rate of 21.4% on top of the advertised and promised price of the music plan. Sirius XM also imposes the U.S. Music Royalty Fee on the relatively few subscribers of its Sirius XM-branded internet-only streaming music plans (which do not require a satellite radio), at a rate of 8.8% on top of the advertised and promised price of the music plan.[5]

24.     The overwhelming majority of Sirius XM subscribers utilize Sirius XM's services in their automobiles. There are approximately 160 million vehicles in operation with Sirius XM radios.[6] Sirius XM's satellite radios are pre-installed in 84% of the over 13 million new

---

[5] The only Sirius XM streaming music plan subscribers who are not charged the U.S. Music Royalty Fee are streaming music subscribers who are signed up and billed through the Apple App Store or Google Play Store platforms.

[6] *See* 2023 10-K of Sirius XM Holdings Inc., p. 5, available at https://investor.siriusxm.com/sec-filings/all-sec-filings/content/0000908937-24-000008/0000908937-24-000008.pdf.

**HATTIS & LUKACS**
11711 SE 8th St, Ste 120
Bellevue, WA 98005
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

automobiles sold each year in the United States.[7] All of the 13 million-plus annual buyers of new vehicles are <u>automatically</u> provided a free two- to six-month trial of Sirius XM service. Sirius XM's satellite radios are also already installed in 51% of the 36 million used automobiles sold each year.[8] Many of the buyers of these used vehicles are likewise automatically enrolled in free Sirius XM trials.

25.     Sirius XM's business model relies on converting these millions of vehicle buyers from free trial users into paid subscribers of automatically renewing music plans.

26.     This effort begins with a revenue-sharing arrangement with the leading automakers: Sirius XM pays over $1 billion a year in subsidies and revenue splits to the automakers.[9] Pursuant to this revenue sharing arrangement, automotive dealerships submit the contact information of their recent car buyers directly to Sirius XM's marketing department. The automakers and auto dealers then get a cut of the Sirius XM subscription revenue that results.

27.     After receiving the contact information of the vehicle buyers, Sirius XM proceeds to inundate them with marketing emails, direct mailers, and telemarketing calls in an attempt to get the consumers to provide their credit or debit card information to Sirius XM so that Sirius XM can sign them up for paid—and automatically renewing—music plan subscriptions.

---

[7] *See* "Car Market Puts Sirius XM's 2022 Growth Plans Into The Slow Lane," InsideRadio.com, July 28, 2022, available at https://www.insideradio.com/free/car-market-puts-Sirius XM-s-2022-growth-plans-into-the-slow-lane/article_c577b85c-0ea6-11ed-a4f3-6316ccfafd88.html#:~:text=Its%20receivers%20are%20now%20installed,satellite%20radio%20don't%20bother.

[8] *Id. Also see* report on used vehicle market based on data from Cox Automotive, at https://www.autonews.com/used-cars/used-car-volume-hits-lowest-mark-nearly-decade#:~:text=The%20number%20of%20used%20cars,about%2035.8%20million%20were%20sold.

[9] For example, in 2016, Sirius XM paid about $1 billion a year in subsidies and revenue splits to automakers. *See* Sisario, Ben, "Sirius XM Fights to Dominate the Dashboard of the Connected Car," New York Times, February 20, 2016 (behind pay wall at https://www.nytimes.com/2016/02/21/business/media/Sirius XM-fights-to-dominate-the-dashboard-of-the-connected-car.html).

HATTIS & LUKACS
11711 SE 8th St, Ste 120
Bellevue, WA 98005
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

A.     **The U.S. Music Royalty Fee.**

28.     The U.S. Music Royalty Fee is an additional flat charge that Sirius XM collects from its music plan subscribers over and above the advertised and promised prices of its music plans. The overwhelming majority of Sirius XM customers subscribe to its <u>satellite radio</u> music plans (which require a satellite radio, and are typically attached to a particular vehicle equipped with a Sirius XM satellite radio). Sirius XM charges its satellite radio music plan subscribers a 21.4% U.S. Music Royalty Fee on top of the advertised and promised price of the music plan.

29.     In 2019, Sirius XM introduced a separate <u>streaming-only</u> music plan option, which worked over the internet and did not utilize or require a satellite radio. A very tiny minority of Sirius XM customers subscribe to such an internet streaming-only music plan. Sirius XM charges its (few) internet streaming-only music plan subscribers an 8.8% U.S. Music Royalty Fee on top of the advertised and promised price of the streaming music plan.

30.     Sirius XM invented and first added the U.S. Music Royalty Fee to its music plans in 2009, at a 13.9% flat rate charge. Since then Sirius XM has increased the Fee to the current 21.4% rate.

31.     Sirius XM's U.S. Music Royalty Fee scheme has been the source of <u>all</u> of Sirius XM's profits for the past several years. For example, in 2023, Sirius XM collected $1.36 billion in U.S. Music Royalty Fee charges, while the entire company had net profits of $1.26 billion. In other words, in 2023, U.S. Music Royalty Fee revenues were equal to 108% of the net profits for the entire company.[10]

---

[10] In 2023, Sirius XM had subscriber revenues from its Sirius XM-branded service of $6.34 billion, approximately 21.4% of which (i.e., $1.36 billion) were payments of the U.S. Music Royalty Fee. *See* 2023 10-K of Sirius XM Holdings Inc., pp. F-5, F-39, available at https://investor.siriusxm.com/sec-filings/all-sec-filings/content/0000908937-24-000008/0000908937-24-000008.pdf.

HATTIS & LUKACS
11711 SE 8th St, Ste 120
Bellevue, WA 98005
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

32.     The U.S. Music Royalty Fee scheme is at the heart of Sirius XM's marketing plan. The scheme enables Sirius XM to falsely advertise its music plans for much lower rates than what Sirius XM actually charges, in order to lure as many consumers as possible into signing up for automatically renewing subscriptions and paying more than they otherwise would have paid.

33.     Meanwhile, Sirius XM is alone in charging such a fee. None of Sirius XM's major music streaming competitors (for example, Apple Music, Spotify, Amazon Music, Google Play Music) charge any such separate music royalty fee over and above their advertised music plan prices. Reasonable consumers would not expect Sirius XM to charge such a fee, let alone hide it as "Fees and Taxes." The U.S. Music Royalty Fee is, in fact, simply a disguised double-charge for the music plan itself.

34.     Sirius XM automatically charges the U.S. Music Royalty Fee to nearly all of its 431,000 Oregon subscribers (the Fee currently accounts for over $17 million in annual charges to Oregon subscribers). Since Sirius XM invented and introduced the Fee in 2009, Plaintiffs estimate that Sirius XM has unlawfully extracted over $130 million from Oregon consumers in U.S. Music Royalty Fee charges.

**B.      Sirius XM Misrepresents the Price of its Music Plans in its Advertisements and Fails to Disclose the U.S. Music Royalty Fee.**

35.     Sirius XM advertises its satellite radio and streaming music plans through marketing directed at the consuming public in Oregon and throughout the United States via email campaigns, direct mail campaigns, telemarketing campaigns, internet advertising, television advertising, and radio advertising. Meanwhile, the tens of millions of automobiles which are equipped with a Sirius XM satellite radio, but which do not have an active trial or a current paid

HATTIS & LUKACS
11711 SE 8th St, Ste 120
Bellevue, WA 98005
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

subscription, will constantly prompt the consumer to subscribe to Sirius XM anytime the consumer switches the car audio system to the Sirius XM radio setting.

36.     Through all of these channels, Sirius XM prominently and misleadingly advertises particular flat monthly or periodic prices for its music plans, without disclosing or including the amount of the U.S. Music Royalty Fee in the advertised price.

37.     <u>None</u> of Sirius XM's advertisements states the true music plan price after adding the amount of the U.S. Music Royalty Fee. <u>None</u> of Sirius XM's advertisements names or mentions the existence of the U.S. Music Royalty Fee or its amount—not even in the fine print. And there is no asterisk adjacent to the (deceptively low) advertised price in any of Sirius XM's advertisements or materials.

38.     Sirius XM's sole advertising disclaimer is that "Fees and taxes apply"—but in reality zero taxes and zero other fees apply, such that the undisclosed U.S. Music Royalty Fee is the one and only "Fees and Taxes" that is charged.

39.     Meanwhile, <u>none</u> of Sirius XM's competitors charge any separate royalty fee over and above the advertised music plan price. Sirius XM knows that reasonable consumers would not expect Sirius XM to charge the U.S. Music Royalty Fee, let alone call it "Fees and Taxes."

**HATTIS & LUKACS**
11711 SE 8th St, Ste 120
Bellevue, WA 98005
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

40.    **Example Promotional Mailer.** Below is an example of a marketing direct mailer sent by Sirius XM in December 2022 to a consumer who was in a Sirius XM free trial that automatically came with a new vehicle:

**Sirius XM Promotional Mailer to Consumer in Free Trial With New Vehicle**



HATTIS & LUKACS
11711 SE 8th St, Ste 120
Bellevue, WA 98005
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

41.    The above mailer is a typical example of the millions of promotional mailers that Sirius XM sends to new vehicle purchasers each year. Notably, the top right of the ad features "Get 12 Months for $5/Month," but makes no mention of the U.S. Music Royalty Fee or the extra 21.4% (i.e., the extra $1.07) that the plan actually costs due to the Fee. There is no asterisk next to the advertised price. <u>Nowhere</u> in the entire mailer—not even in the fine print at the bottom—is there <u>any</u> mention whatsoever of the U.S. Music Royalty Fee or its amount. The only disclosure language in the entire mailer is the phrase "Fees and taxes apply," which is in small print in the circle on the left of the ad, where it also says "See Offer Details below."

42.    But the "Offer Details" (which can be found in the fine print at the bottom of the mailer) likewise only state the same phrase "Fees and taxes apply," with no further details. It does not mention the U.S. Music Royalty Fee by name or what the additional "Fees and taxes" are or their amounts. The "Offer Details" fine print states that the plan will renew after the 12-month promotion "at then-current rates (currently, $17.99)"—but again does not disclose that the actual rate the plan will be renewed at is 21.4% higher (at a true rate of $21.84) due to the U.S. Music Royalty Fee. Nor does the mailer mention that, as the music plan rate increases from $5 to $17.99, the (undisclosed) Fee will more than triple from $1.07 to $3.85.[11]

---

[11] The intentional nature of Sirius XM's misrepresentations and omissions are further evidenced by the fact that while the <u>United States</u> company Sirius XM Radio Inc. (the Defendant) made the decision to completely avoid mentioning the name of the U.S. Music Royalty Fee or its amount in any of its advertising, the company's <u>Canadian</u> sister company, Sirius XM Canada Inc., chose a different, more honest approach. Sirius XM Canada Inc. (unlike Defendant) discloses both the name of the fee (which in Canada is called the "Music Royalty and Administrative Fee") and its percentage amount in the "Offer Details" fine print of its otherwise identical ads.

**HATTIS & LUKACS**
11711 SE 8th St, Ste 120
Bellevue, WA 98005
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

43.    **Example Marketing Email.** Below is an example of a marketing email sent by Sirius XM in February 2023 to a consumer whose free Sirius XM trial elapsed (the free trial came with the purchase of a new vehicle):

**Sirius XM Promotional Email to Consumer Whose Free Trial Elapsed**



44.    The above email is a typical example of the millions of emails Sirius XM sends to purchasers of new automobiles who are in an automatic free trial of Sirius XM or whose trial has

CLASS ACTION COMPLAINT                - 13 -

elapsed. Notably, the email states the price is "JUST $5/MO," but makes no mention of the U.S. Music Royalty Fee or the extra 21.4% (i.e., the extra $1.07) that the plan actually costs due to the Fee. There is no asterisk next to the advertised price, and in fact nowhere in the entire email— not even in the fine print at the bottom—is there any mention whatsoever of the U.S. Music Royalty Fee or its amount. There is a phrase "See Offer Details," but there is no "Offer Details" section in the email. It turns out that the white "Offer Details" text is a non-obvious hyperlink (with no hyperlink indicators). If the consumer figured out to click on the "Offer Details" text on the email, the consumer would be brought to the webpage below:



HATTIS & LUKACS
11711 SE 8th St, Ste 120
Bellevue, WA 98005
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

45.     This offer/disclaimer webpage features "$5/mo for 12 months," but makes no mention of the U.S. Music Royalty Fee or the extra 21.4% (i.e., the extra $1.07) which the plan actually costs due to the Fee. Below the prominent text "$5/mo for 12 months," smaller text reads "Then $18.99/mo. Fees & taxes apply. See **Offer Details** below."

46.     But the fine print "Offer Details" at the bottom of the webpage states only the same phrase "Fees and Taxes apply," with no further details. It does not mention the U.S. Music Royalty Fee by name or what the additional "Fees and Taxes" are or their amounts. It also fails to mention that the renewal rate will not be the promised "$18.99/mo." but rather will be 21.4% higher—where the undisclosed Fee will increase nearly four-fold to $4.06—for an actual total of $23.05 per month.

### C.     Sirius XM Fails to Disclose the U.S. Music Royalty Fee to Consumers When They Sign Up on Its Website.

47.     For years, Sirius XM's consumer website has advertised its music plans by featuring particular flat monthly or periodic prices for the plans, without disclosing or including the amount of the U.S. Music Royalty Fee in the advertised price.

**HATTIS & LUKACS**
11711 SE 8th St, Ste 120
Bellevue, WA 98005
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

48.    For example, in May 2023, Sirius XM's website listed the following music plans
(on the "Browse Plans and Pricing" webpage).

**Music Plans Offered on the Sirius XM Website**



49.    All of these options (including both the 3-month promotional $1 price, and the
stated higher prices after the 3 months) are presented as having a flat rate. The prices exclude the
additional 21.4% charge for the U.S. Music Royalty Fee. The prices do not have asterisks and the
only disclosure language is on the left side, where smaller print says, "Plus fees and taxes See
Offer Details Below." But the "Offer Details" at the bottom of the webpage (which follows a

**HATTIS & LUKACS**
11711 SE 8th St, Ste 120
Bellevue, WA 98005
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

section of "Frequently Asked Questions" that likewise makes no mention of the Fee), states only the same phrase "Fees and taxes apply." It does not mention the U.S. Music Royalty Fee by name or what the additional "Fees and taxes" are or their amounts.

50.    If the consumer clicks on the blue "GET" button for the respective music plan, the consumer is taken through Sirius XM's online purchase process. Each page of the purchase process features "$1 for 3 months" on the top, and smaller text stating the higher price after the 3 months (e.g., "Then 23.99/mo.").

**HATTIS & LUKACS**
11711 SE 8th St, Ste 120
Bellevue, WA 98005
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

51.    **Below is the final page of the online purchase process** (i.e., the order submission page) for the Platinum music plan. This final page is the only page of the entire online purchase process which lists a specific additional amount for "Fees and Taxes."



52.    Under "Order Summary," Sirius XM shows a price of $1.00 for 3 months of the music plan ($0.33/mo), plus "Fees and Taxes" of $0.21.

53.    Notably, counsel's investigation showed that all Sirius XM music plans (including this one) sold in Oregon have $0.00 in "Taxes." And the only "Fee" Sirius XM ever charges in Oregon is the undisclosed 21.4% U.S. Music Royalty Fee. Sirius XM disguises the amount of its invented and deceptive U.S. Music Royalty Fee as "Fees and Taxes." Yet in reality, the U.S. Music Royalty Fee is the sole and exclusive component of the so-called "Fees and Taxes."

54.    In this example, the $0.21 in "Fees and Taxes" is comprised entirely of the unmentioned 21.4% U.S. Music Royalty Fee (i.e., $0.21 = 21.4% of the $1.00 plan price). Similarly, when the promotional rate of "$1.00 for 3 months" expires and the subscriber's monthly rate automatically increases to the stated "$23.99/mo.," the U.S. Music Royalty Fee comprises the entire amount of the additional "Fees and Taxes" of $5.13 per month.

55.    Sirius XM knows and intends that reasonable consumers will understand and assume that the amount listed as "Fees and Taxes" is comprised of legitimate taxes and government-related fees passed on by Sirius XM to its subscribers. Sirius XM knows and intends that reasonable consumers would not expect that Sirius XM—unlike every other music streaming service—would invent and charge the so-called "U.S. Music Royalty Fee" over and above the advertised price for the music plan. And Sirius XM knows that consumers certainly would not expect such a charge to be disguised as "Fees and Taxes."

**D.**    **Sirius XM Fails to Disclose the U.S. Music Royalty Fee to Consumers When They Sign Up Over the Phone.**

56.    Likewise, Sirius XM sales and customer service agents have been trained for years, as a matter of company policy, to present consumers with advertised flat monthly or

HATTIS & LUKACS
11711 SE 8th St, Ste 120
Bellevue, WA 98005
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

periodic prices for its music plans without disclosing the U.S. Music Royalty Fee. The music

plan prices that agents quote to consumers—just like Sirius XM's advertising—exclude the cost

of the U.S. Music Royalty Fee. At most, agents may say the cost is the advertised or quoted price

plus unspecified "Fees and Taxes." Sirius XM knows and intends that a reasonable consumer

would interpret the phrase "Fees and Taxes" to mean only taxes or government-related fees.

> **E.** **<u>In Order to Prevent Subscribers From Learning of Its Scheme, Sirius XM Signs Up Subscribers for Auto-Renewal by Default and Then Never Sends Them Monthly or Ongoing Billing Notices or Invoices.</u>**

57.     Sirius XM's automatic renewal and billing process are designed to prevent its

subscribers from learning of its U.S. Music Royalty Fee scheme. Sirius XM signs up subscribers

for automatic renewal by default (most subscribers have monthly plans, but Sirius XM also

offers quarterly, semi-annual, and longer plans).

58.     Once consumers have been lured to sign up, Sirius XM prevents them from

learning about its scheme by never thereafter sending them monthly or ongoing billing notices or

invoices. All the while, Sirius XM silently and automatically renews their subscriptions month

after month and year after year

59.     Most Sirius XM subscribers initially sign up with Sirius XM by providing their

credit card or debit card for a free multi-month trial or for a multi-month greatly discounted

promotional rate. The only evidence of the ongoing monthly (or other subscription term) charges

by Sirius XM that a subscriber may find is on his or her bank or credit card billing statement—

which only lists a dollar amount and makes no mention of the U.S. Music Royalty Fee.

60.     It is telling that while Sirius XM intentionally sends <u>zero</u> monthly or ongoing

billing notices or invoices to its subscribers, Sirius XM meanwhile makes sure to inundate and

benumb these same subscribers with <u>marketing</u> emails nearly every other day (totaling over a

dozen each month), such that subscribers come to assume that any emails they receive from Sirius XM are marketing or promotional emails.

      **F.**    **<u>Sirius XM Continues to Deceive Subscribers After They Sign Up.</u>**

     61.     Sirius XM continues to deceive subscribers about the true price of its music plans and about the existence and nature of the U.S. Music Royalty Fee, even after they have signed up.

     62.     Once consumers have been lured to sign up, Sirius XM prevents them from learning about its scheme by never thereafter sending them monthly or ongoing billing notices or invoices.

     63.     Meanwhile, if the subscriber were to log into his or her customer account on the Sirius XM website, the default view shows only the total amount due and does not list, let alone explain, the U.S. Music Royalty Fee.

     64.     Even <u>if</u> a subscriber discovered the existence of the U.S. Music Royalty Fee, Sirius XM has taken actions and implemented policies to intentionally mislead the subscriber into thinking it is "government mandated" or is a government pass-through fee.

     65.     First, Sirius XM intentionally chose a name for the Fee that suggests it is a government fee. Sirius XM calls it a "U.S." fee to falsely indicate to consumers (i.e., to those few subscribers who learn about its existence) that it is government mandated or a government pass-through fee.

     66.     Second, in the event that a subscriber contacts Sirius XM to inquire about the Fee, Sirius XM agents outright falsely tell the subscriber that the Fee is "government mandated" or is a government pass-through fee.

**HATTIS & LUKACS**
11711 SE 8th St, Ste 120
Bellevue, WA 98005
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

67.     For example, below is a screenshot of part of an online chat conversation that a subscriber had with Sirius XM on March 10, 2023, where the Sirius XM agent falsely told the subscriber that the U.S. Music Royalty Fee was "government mandated":



68.     The chat agent's statement that the U.S. Music Royalty Fee was "government mandated" reflects Sirius XM's policy of falsely telling subscribers who ask about the Fee that it is government mandated or is a government pass-through fee.

## V.     PLAINTIFFS' FACTUAL ALLEGATIONS

### Plaintiff Kara Kirkpatrick

69.     Plaintiff Kara Kirkpatrick is, and at all relevant times has been, a citizen and resident of the city of Portland, in Multnomah County, Oregon.

HATTIS & LUKACS
11711 SE 8th St, Ste 120
Bellevue, WA 98005
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

70.     In early 2021, Ms. Kirkpatrick's parents passed away, and she received their old car which was equipped with a Sirius XM satellite radio.

71.     In March 2021, Ms. Kirkpatrick called Sirius XM to learn about Sirius XM's music plans and prices. The agent quoted her a specific price of $21.99 a month plus "fees and taxes" for Sirius XM's All Access music plan. The music plan's price of $21.99 did not include the cost of the U.S. Music Royalty Fee. The agent also did not mention the existence of the U.S. Music Royalty Fee.

72.     Relying on the representations of the Sirius XM agent, Ms. Kirkpatrick gave her credit card information to the agent and purchased the music plan subscription.

73.     Each month thereafter, Sirius XM silently and automatically charged Ms. Kirkpatrick's credit card, without giving her any email or mail notice whatsoever of the upcoming monthly charges and without ever emailing or mailing her a single monthly billing statement or invoice.

74.     Meanwhile, each and every month, Sirius XM inundated Ms. Kirkpatrick's email inbox with a dozen or so marketing and promotional emails. None of these marketing emails made any mention whatsoever of the existence of the U.S. Music Royalty Fee.

75.     Ms. Kirkpatrick canceled her music plan subscription in early 2023.

76.     When Ms. Kirkpatrick signed up for her Sirius XM music plan, she was relying on Sirius XM's explicit representations regarding the monthly price of the music plan. Ms. Kirkpatrick did not expect (and she was never told) that Sirius XM would actually charge her an additional music plan charge on top of the advertised and quoted music plan price in the form of a so-called U.S. Music Royalty Fee or that the true price of the music plan would include the 21.4% additional cost of the U.S. Music Royalty Fee. That information would have been

CLASS ACTION COMPLAINT                    - 23 -

material to her. Had she known that information she would not have been willing to pay as much for her music plan and would have acted differently.

77.     Ms. Kirkpatrick has a legal right to rely now, and in the future, on the truthfulness and accuracy of Sirius XM's representations and advertisements regarding its music plan prices. Ms. Kirkpatrick believes that she was given the services Sirius XM promised her—just not at the price Sirius XM promised and advertised to her.

78.     Ms. Kirkpatrick desires to sign up for Sirius XM music plans in the future. However, Ms. Kirkpatrick wants to be confident that the advertised and quoted price for Sirius XM's music plans is the true and full price for the plan (i.e., that it includes all applicable discretionary monthly service charges such as the U.S. Music Royalty Fee). And, if Sirius XM introduces any new or invented discretionary monthly service charge (like it did with the U.S. Music Royalty Fee), Ms. Kirkpatrick wants to be confident that Sirius XM will include the amount of that service charge in the advertised and quoted music plan price. Ms. Kirkpatrick will be harmed if, in the future, she is left to guess as to whether Sirius XM's representations are accurate and whether there are omissions of material facts regarding the music plans being advertised and represented to her.

79.     Ms. Kirkpatrick first learned of Sirius XM's U.S. Music Royalty Fee scheme on March 3, 2023, when she saw a legal investigation advertisement on TopClassActions.com discussing the scheme. Prior to reading the advertisement, Ms. Kirkpatrick did not know or suspect that Sirius XM had been secretly adding an additional music plan charge above the quoted rate in the form of the U.S. Music Royalty Fee. Ms. Kirkpatrick completed and submitted a form on the investigation webpage that same day, March 3, 2023, to learn if she qualified to be part of the legal actions.

HATTIS & LUKACS
11711 SE 8th St, Ste 120
Bellevue, WA 98005
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

80.     On March 22, 2023, Ms. Kirkpatrick sent Sirius XM a notice of dispute regarding her claims concerning Sirius XM's deceptive pricing and the U.S. Music Royalty Fee. Sirius XM made no effort to resolve the dispute.

81.     On June 5, 2023, Ms. Kirkpatrick filed a demand for arbitration against Sirius XM with the American Arbitration Association ("AAA").

82.     Ms. Kirkpatrick paid all arbitration fees associated with her demand for arbitration that the AAA asked her to pay.

83.     The AAA then asked Sirius XM to pay its required arbitration fees by August 28, 2023.

84.     On August 7, 2023, Sirius XM wrote a letter to the AAA stating that it would not pay its required arbitration fees.

85.     On September 6, 2023, the AAA administratively closed Ms. Kirkpatrick's case due to Sirius XM's failure to pay its required arbitration fees.

**Plaintiff Gillian Maxfield**

86.     Plaintiff Gillian Maxfield was at all relevant times a citizen and resident of the city of Portland, in Multnomah County, Oregon.

87.     In 2014, Ms. Maxfield purchased a new car and was offered a free one-year trial subscription to SiriusXM's "All Access" plan if she signed up on the spot and provided her credit card information. Ms. Maxfield accepted this offer for the free one-year trial.

88.     After the one year passed, Ms. Maxfield noticed a large charge on her credit card statement from Sirius XM. Ms. Maxfield then called Sirius XM regarding the charge. The Sirius XM agent that Ms. Maxfield spoke to offered her a specific promotional price for a six-month music plan subscription, along with a partial credit of her prior charge. The quoted and promised

price did not include the additional amount of the U.S. Music Royalty Fee, and the agent also did not mention the existence of the U.S. Music Royalty Fee.

89.     Relying on the representations of the Sirius XM agent, Ms. Maxfield purchased the six-month music plan subscription.

90.     When her six-month subscription ended, Sirius XM silently and automatically charged Ms. Maxfield for another six-month subscription, but at the regular rate of the music plan. When Ms. Maxfield noticed this charge on her credit card, she called Sirius XM to ask for another six-month promotional price for the music plan. The agent agreed to give her another six-month promotional price and credited her account the difference between the regular price and the new promotional price.

91.     This same process occurred several more times before she eventually canceled her subscription in 2021—every six months, Sirius XM would charge her for a six-month subscription at its regular rate; Ms. Maxfield would notice the charge on her credit card and call to ask for a new promotional price; and the agent would give her a new promotional price and credit her account for the difference. In every instance, the quoted and promised price did not include the additional amount of the U.S. Music Royalty Fee and the agent did not mention the existence of the U.S. Music Royalty Fee.

92.     Sirius XM never emailed or mailed Ms. Maxfield a single monthly or periodic billing notice or invoice.

93.     Meanwhile, each and every month, Sirius XM inundated Ms. Maxfield's email inbox with a dozen or so marketing and promotional emails. None of these marketing emails made any mention whatsoever of the existence of the U.S. Music Royalty Fee.

94.     Ms. Maxfield canceled her music plan subscription in 2021.

HATTIS & LUKACS
11711 SE 8th St, Ste 120
Bellevue, WA 98005
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

95. Each time that Ms. Maxfield signed up for a Sirius XM music plan, she was relying on Sirius XM's explicit representations regarding the price of the music plan. Ms. Maxfield did not expect (and she was never told) that Sirius XM would actually charge her an additional music plan charge on top of the advertised and quoted music plan price in the form of a so-called U.S. Music Royalty Fee or that the true price of the music plan would include the 21.4% additional cost of the U.S. Music Royalty Fee. That information would have been material to her. Had she known that information she would not have been willing to pay as much for her music plans and would have acted differently.

96. Ms. Maxfield has a legal right to rely now, and in the future, on the truthfulness and accuracy of Sirius XM's representations and advertisements regarding its music plan prices. Ms. Maxfield believes that she was given the services Sirius XM promised her—just not at the prices Sirius XM promised and advertised to her.

97. Ms. Maxfield desires to sign up for Sirius XM music plans in the future. However, Ms. Maxfield wants to be confident that the advertised and quoted price for Sirius XM's music plans is the true and full price for the plan (i.e., that it includes all applicable discretionary monthly service charges such as the U.S. Music Royalty Fee). And, if Sirius XM introduces any new or invented discretionary monthly service charge (like it did with the U.S. Music Royalty Fee), Ms. Maxfield wants to be confident that Sirius XM will include the amount of that service charge in the advertised and quoted music plan price. Ms. Maxfield will be harmed if, in the future, she is left to guess as to whether Sirius XM's representations are accurate and whether there are omissions of material facts regarding the music plans being advertised and represented to her.

HATTIS & LUKACS
11711 SE 8th St, Ste 120
Bellevue, WA 98005
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

98.     Ms. Maxfield first learned of Sirius XM's U.S. Music Royalty Fee scheme on July 2, 2023, when she saw a legal investigation webpage on the Hattislaw.com website that discussing the scheme. Prior to reading the investigation webpage, Ms. Maxfield did not know or suspect that Sirius XM had been secretly adding an additional music plan charge above the quoted rate in the form of the U.S. Music Royalty Fee. Ms. Maxfield completed and submitted a form on the investigation webpage that same day, July 2, 2023, to learn if she qualified to be part of the legal actions.

99.     On July 11, 2023, Ms. Maxfield sent Sirius XM a notice of dispute regarding her claims concerning Sirius XM's deceptive pricing and the U.S. Music Royalty Fee. Sirius XM made no effort to resolve the dispute.

100.    On September 14, 2023, Ms. Maxfield filed a demand for arbitration against Sirius XM with the American Arbitration Association ("AAA").

101.    Ms. Maxfield paid all arbitration fees associated with her demand for arbitration that the AAA asked her to pay.

102.    The AAA then asked Sirius XM to pay its required arbitration fees by February 7, 2024.

103.    On January 11, 2024, Sirius XM wrote a letter to the AAA stating that it would not pay its required arbitration fees.

104.    On February 14, 2024, the AAA administratively closed Ms. Maxfield's case due to Sirius XM's failure to pay its required arbitration fees.

**Plaintiff Anna DeMarco**

105.    Plaintiff Anna DeMarco is, and at all relevant times has been, a citizen and resident of the city of Marcola, in Lane County, Oregon.

CLASS ACTION COMPLAINT                    - 28 -

106.     In March 2015, Ms. DeMarco purchased a new car which came with a free two-month Sirius XM "All Access" plan trial subscription (Sirius XM later renamed the All Access plan to the "Platinum" plan in July 2021).

107.     After the free trial subscription expired, Ms. DeMarco called Sirius XM and spoke to a Sirius XM agent to learn about Sirius XM's music plans and prices. The agent quoted her a specific price of $19.99 a month plus "fees and taxes" for the music plan that she chose. The $19.99 price did not include the cost of the U.S. Music Royalty Fee. The agent also did not mention the existence of the U.S. Music Royalty Fee.

108.     Relying on the representations of the Sirius XM agent, Ms. DeMarco gave her credit card information to the agent and purchased the music plan subscription.

109.     A little while later, Ms. DeMarco called Sirius XM to try to save money on her music plan. The Sirius XM agent that she talked with agreed to give her a lower promotional rate for a fixed period of time. The agent quoted her a specific price for the music plan. That price did not include the additional amount of the U.S. Music Royalty Fee, and the agent also did not mention the existence of the U.S. Music Royalty Fee.

110.     Each month thereafter, Sirius XM silently and automatically charged Ms. DeMarco's credit card, without giving her any email or mail notice whatsoever of the upcoming monthly charges and without ever emailing or mailing her a single monthly billing notice or invoice.

111.     Around February 2022, Ms. DeMarco called Sirius XM to ask for a lower-priced music plan. However, the agent that she talked with did not quote her a low enough price, so she canceled her subscription.

**HATTIS & LUKACS**
11711 SE 8th St, Ste 120
Bellevue, WA 98005
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

112.    Around September 2022, Ms. DeMarco called Sirius XM again to see if she could get a music plan at a low enough price that she could be happy with. This time, the agent that she spoke with offered her a two-year promotional rate for the Music & Entertainment plan, at a quoted price of $119.76 plus "fees and taxes" for the two years on the condition that she pay for full price up front. The music plan's price of $119.76 did not include the cost of the U.S. Music Royalty Fee. The agent also did not mention the existence of the U.S. Music Royalty Fee.

113.    Relying on the representations of the Sirius XM agent, Ms. DeMarco purchased the music plan subscription.

114.    Since Ms. DeMarco signed up, Sirius XM has never emailed or mailed her a single monthly billing notice or invoice. Meanwhile, Sirius XM has inundated Ms. DeMarco's email inbox with a dozen or so marketing and promotional emails each and every month. None of these marketing emails made any mention whatsoever of the existence of the U.S. Music Royalty Fee.

115.    Each time that Ms. DeMarco signed up for a Sirius XM music plan, she was relying on Sirius XM's explicit representations regarding the monthly price of the music plan. Ms. DeMarco did not expect (and she was never told) that Sirius XM would actually charge her an additional music plan charge on top of the advertised and quoted music plan price in the form of a so-called U.S. Music Royalty Fee or that the true price of the music plan would include the 21.4% additional cost of the U.S. Music Royalty Fee. That information would have been material to her. Had she known that information she would not have been willing to pay as much for her music plans and would have acted differently.

116.    Ms. DeMarco has a legal right to rely now, and in the future, on the truthfulness and accuracy of Sirius XM's representations and advertisements regarding its music plan prices.

HATTIS & LUKACS
11711 SE 8th St, Ste 120
Bellevue, WA 98005
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

Ms. DeMarco believes that she was given the services Sirius XM promised her—just not at the prices Sirius XM promised and advertised to her.

117.    Ms. DeMarco remains a Sirius XM subscriber as of this filing. Ms. DeMarco desires to sign up for Sirius XM music plans in the future. However, Ms. DeMarco wants to be confident that the advertised and quoted price for Sirius XM's music plans is the true and full price for the plan (i.e., that it includes all applicable discretionary monthly service charges such as the U.S. Music Royalty Fee). And, if Sirius XM introduces any new or invented discretionary monthly service charge (like it did with the U.S. Music Royalty Fee), Ms. DeMarco wants to be confident that Sirius XM will include the amount of that service charge in the advertised and quoted music plan price. Ms. DeMarco will be harmed if, in the future, she is left to guess as to whether Sirius XM's representations are accurate and whether there are omissions of material facts regarding the music plans being advertised and represented to her.

118.    Ms. DeMarco first learned of Sirius XM's U.S. Music Royalty Fee scheme on March 10, 2023, when she saw a legal investigation advertisement on TopClassActions.com discussing the scheme. Prior to reading the advertisement, Ms. DeMarco did not know or suspect that Sirius XM was secretly adding an additional music plan charge above the quoted rate in the form of the U.S. Music Royalty Fee. Ms. DeMarco completed and submitted a form on the investigation webpage that same day, March 10, 2023, to learn if she qualified to be part of the legal actions.

119.    On March 22, 2023, Ms. DeMarco sent Sirius XM a notice of dispute regarding her claims concerning Sirius XM's deceptive pricing and the U.S. Music Royalty Fee. Sirius XM made no effort to resolve the dispute.

HATTIS & LUKACS
11711 SE 8ᵗʰ St, Ste 120
Bellevue, WA 98005
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

120.    On June 5, 2023, Ms. DeMarco filed a demand for arbitration against Sirius XM with the American Arbitration Association ("AAA").

121.    Ms. DeMarco paid all arbitration fees associated with her demand for arbitration that the AAA asked her to pay.

122.    The AAA then asked Sirius XM to pay its required arbitration fees by August 28, 2023.

123.    On August 7, 2023, Sirius XM wrote a letter to the AAA stating that it would not pay its required arbitration fees.

124.    On September 6, 2023, the AAA administratively closed Ms. DeMarco's case due to Sirius XM's failure to pay its required arbitration fees.

**Plaintiff Cody Michael**

125.    Plaintiff Cody Michael is, and at all relevant times has been, a citizen and resident of the city of Salem, in Marion County, Oregon.

126.    Mr. Michael purchased a used car from a car dealership in 2020 which came with a free Sirius XM trial subscription. At the time, he had no interest in signing up for Sirius XM so he did not utilize the free trial. However, Mr. Michael continued to received numerous promotional emails from Sirius XM encouraging him to sign up for a music plan.

127.    In March 2022, after viewing a promotional email from Sirius XM, Mr. Michael decided to learn more about Sirius XM's music plans.

128.    Mr. Michael visited Sirius XM's website and saw an advertisement for a promotional offer for Sirius XM's Music & Entertainment satellite radio music plan at a rate of $29.94 for a six-month period. Mr. Michael selected the plan and went through the online purchase process. Throughout the online purchase process, Sirius XM promised Mr. Michael that

**HATTIS & LUKACS**
11711 SE 8th St, Ste 120
Bellevue, WA 98005
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

he would enjoy a six-month subscription to Sirius XM's Music & Entertainment music plan for $29.94. None of the webpages made any reference to the U.S. Music Royalty Fee or its amount. On one of the pages of the purchase process, Sirius XM prompted Mr. Michael to enter his credit card information, which he did.

129.    On the final page of the purchase process (the order submission page), Mr. Michael viewed a webpage similar to the screenshot printed above at ¶ 51. The webpage made no mention of the U.S. Music Royalty Fee. Under the "Order Summary" section, Sirius XM stated that he would be charged $29.94 for six months of the Music & Entertainment music plan plus unspecified "Fees and Taxes."

130.    Based on these representations, Mr. Michael submitted his order by clicking on the "Complete My Order" button.

131.    At no point was Mr. Michael aware that Sirius XM would bill him any additional monthly music plan charges above the $29.94 price for the six months of the Music & Entertainment music plan. At no point did Mr. Michael view any mention of the existence of the U.S. Music Royalty Fee or its amount. Mr. Michael assumed that by "Fees and Taxes," Sirius XM meant legitimate taxes and government-related fees. Mr. Michael had no idea that the "Fees and Taxes" amount was not actually comprised of any taxes or legitimate government-related fees whatsoever. Mr. Michael had no idea that in fact 100% of the purported "Fees and Taxes" amount was to pay for Sirius XM's invented U.S. Music Royalty Fee—which was just a way for Sirius XM to charge more for the music plan itself while disguising it as a government pass-through charge.

132.    After Mr. Michael signed up for the satellite radio music plan in March 2022, he was unable to access and utilize his subscription. Mr. Michael was also was unable to find or

access any account related to him or his car on the Sirius XM website. Mr. Michael assumed that his original subscription he signed up for had not been processed properly or had not gone through, and he thought he therefore needed to sign up again for a music plan.

133.    In June 2022, Mr. Michael again went to the Sirius XM website, and this time saw an advertisement for a "Streaming Platinum" music plan (an internet streaming-only plan) for $10.99 a month. Mr. Michael selected the plan and went through the online purchase process. Throughout the online purchase process, Sirius XM promised Mr. Michael that he would enjoy a subscription to the Streaming Platinum plan for a monthly price of $10.99 per month. None of the webpages made any reference to the U.S. Music Royalty Fee or its amount. The $10.99 price did not include the cost of the U.S. Music Royalty Fee.

134.    On the final page of the purchase process (the order submission page), Mr. Michael again viewed a webpage similar to the screenshot printed above at ¶ 51. The webpage made no mention of the U.S. Music Royalty Fee. Under the "Order Summary" section, Sirius XM stated that he would be charged $10.99 per month for the Streaming Platinum plan plus unspecified "Fees and Taxes."

135.    Based on these representations, Mr. Michael submitted his order by clicking on the "Complete My Order" button.

136.    At no point was Mr. Michael aware that Sirius XM would bill him any additional monthly music plan charges above the $10.99 advertised and promised plan price. At no point did Mr. Michael view any mention of the existence of the U.S. Music Royalty Fee or its amount. Mr. Michael assumed that by "Fees and Taxes," Sirius XM meant legitimate taxes and government-related fees. Mr. Michael had no idea that the "Fees and Taxes" amount was not actually comprised of any taxes or legitimate government-related fees whatsoever. Mr. Michael

CLASS ACTION COMPLAINT                  - 34 -

had no idea that in fact 100% of the purported "Fees and Taxes" amount was to pay for Sirius

XM's invented U.S. Music Royalty Fee—which was just a way for Sirius XM to charge more for

the music plan itself while disguising it as a government pass-through charge.

137.    After Mr. Michael signed up, Sirius XM never emailed or mailed him a single

monthly billing notice or invoice. Meanwhile, Sirius XM inundated his email inbox with a dozen

or so marketing and promotional emails each and every month. None of these marketing emails

made any mention whatsoever of the existence of the U.S. Music Royalty Fee.

138.    In December 2022, Mr. Michael canceled his Sirius XM subscription.

139.    Each time that Mr. Michael signed up for a Sirius XM music plan, he was relying

on Sirius XM's explicit representations regarding the specific price of the music plan.

Mr. Michael did not expect (and he was never told) that Sirius XM would actually charge him an

additional music plan charge on top of the advertised and quoted music plan price in the form of

a so-called U.S. Music Royalty Fee. Mr. Michael did not expect (and he was never told) that the

true price of the music plan would include an additional charge for the U.S. Music Royalty Fee

of 21.4% for the satellite radio music plan or 8.8% for the streaming-only music plan. That

information would have been material to him. Had he known that information he would not have

been willing to pay as much for his music plans and would have acted differently.

140.    Mr. Michael has a legal right to rely now, and in the future, on the truthfulness

and accuracy of Sirius XM's representations and advertisements regarding its music plan prices.

141.    Mr. Michael desires to sign up for Sirius XM music plans in the future. However,

Mr. Michael wants to be confident that the advertised and quoted price for Sirius XM's music

plans is the true and full price for the plan (i.e., that it includes all applicable discretionary

monthly service charges such as the U.S. Music Royalty Fee). And, if Sirius XM introduces any

HATTIS & LUKACS
11711 SE 8th St, Ste 120
Bellevue, WA 98005
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

new or invented discretionary monthly service charge (like it did with the U.S. Music Royalty Fee), Mr. Michael wants to be confident that Sirius XM will include the amount of that service charge in the advertised and quoted music plan price. Mr. Michael will be harmed if, in the future, he is left to guess as to whether Sirius XM's representations are accurate and whether there are omissions of material facts regarding the music plans being advertised and represented to him.

142.    Mr. Michael first learned of Sirius XM's U.S. Music Royalty Fee scheme on July 18, 2023, when he saw a legal investigation advertisement on TopClassActions.com discussing the scheme. Prior to reading the advertisement, Mr. Michael did not know or suspect that Sirius XM had been secretly adding an additional music plan charge above the quoted rate in the form of the U.S. Music Royalty Fee. Mr. Michael completed and submitted a form on the investigation webpage that same day, July 18, 2023, to learn if he qualified to be part of the legal actions.

143.    On July 19, 2023, Mr. Michael sent Sirius XM a notice of dispute regarding his claims concerning Sirius XM's deceptive pricing and the U.S. Music Royalty Fee. Sirius XM made no effort to resolve the dispute.

144.    On October 24, 2023, Mr. Michael filed a demand for arbitration against Sirius XM with the American Arbitration Association ("AAA").

145.    Mr. Michael paid all arbitration fees associated with his demand for arbitration that the AAA asked him to pay.

146.    The AAA then asked Sirius XM to pay its required arbitration fees by February 7, 2024.

**HATTIS & LUKACS**
11711 SE 8th St, Ste 120
Bellevue, WA 98005
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

147.    On January 11, 2024, Sirius XM wrote a letter to the AAA stating that it would not pay its required arbitration fees.

148.    On February 14, 2024, the AAA administratively closed Mr. Michael's case due to Sirius XM's failure to pay its required arbitration fees.

## VI.    **CLASS ALLEGATIONS**

149.    Plaintiffs Kara Kirkpatrick, Gillian Maxfield, Anna DeMarco, and Cody Michael bring this lawsuit on behalf of themselves, and all others similarly situated, pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3).

150.    **Class Definition:** Plaintiffs seek to represent the following Class:

> **All current and former Sirius XM subscribers in Oregon who paid a "U.S. Music Royalty Fee" within the applicable statute of limitations.**

151.    **Application of the Discovery Rule.** This Court should apply the discovery rule to extend any applicable limitations period and corresponding class period to the date on which Sirius XM first began charging the U.S. Music Royalty Fee—which, based on the investigation of Plaintiffs' counsel, is in 2009. The nature of Sirius XM's misconduct was non-obvious and intentionally concealed from its subscribers. As a result of Sirius XM's intentional misconduct, omissions, and affirmative misrepresentations throughout the customer lifecycle, neither Plaintiffs nor the members of the Class could have, through the use of reasonable diligence, learned of the accrual of their claims against Sirius XM at an earlier time.

152.    Specifically excluded from the Class are Sirius XM and any entities in which Sirius XM has a controlling interest, Sirius XM's agents and employees, the bench officers to whom this civil action is assigned, and the members of each bench officer's staff and immediate family.

**HATTIS & LUKACS**
11711 SE 8th St, Ste 120
Bellevue, WA 98005
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

153.    **Numerosity.** The number of members of the Class are so numerous that joinder of all members would be impracticable. Plaintiffs do not know the exact number of Class members prior to discovery. However, based on information and belief, the Class comprises hundreds of thousands of individuals. The exact number and identities of Class members are contained in Sirius XM's records and can be easily ascertained from those records.

154.    **Commonality and Predominance.** This action involves multiple common legal or factual questions which are capable of generating class-wide answers that will drive the resolution of this case. These common questions predominate over any questions affecting individual Class members, if any. These common questions include, but are not limited to, the following:

a.    Whether Sirius XM employed a uniform policy of charging the U.S. Music Royalty Fee to Plaintiffs and Class members who subscribed to its music plans;

b.    Whether Sirius XM's policy and practice of advertising and quoting the prices of its music plans without the amount of the U.S. Music Royalty Fee is false, deceptive, or misleading;

c.    Why did Sirius XM not include the amounts of the U.S. Music Royalty Fee in the advertised and quoted prices for its music plans;

d.    Whether Sirius XM adequately and accurately disclosed the existence of the U.S. Music Royalty Fee, its nature or basis, or its amount, to Plaintiffs and Class members;

e.    What is the nature or purpose of the U.S. Music Royalty Fee;

f.    Whether it was deceptive, misleading, and/or false for Sirius XM to put "U.S." in the beginning of the name of the U.S. Music Royalty Fee;

**HATTIS & LUKACS**
11711 SE 8th St, Ste 120
Bellevue, WA 98005
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

g.      Whether the true prices of Sirius XM's music plans, and of the U.S. Music Royalty Fee, are material information, such that a reasonable consumer would find that information important to the consumer's purchase decision;

h.      Whether Sirius XM has a policy and practice of signing up subscribers for automatic renewal, but never thereafter sending the subscriber any monthly or ongoing billing notices or invoices;

i.      Whether Sirius XM has a policy of intentionally preventing subscribers from noticing that they are being charged the Fee, including, but not limited to, Sirius XM's practice of signing up subscribers for automatic renewal but then never thereafter sending the subscriber any monthly or ongoing billing notices or invoices;

j.      Whether Sirius XM has a policy and practice of falsely telling subscribers who notice and inquire about the U.S. Music Royalty Fee that it is "government mandated" or is a government pass-through fee;

k.      Whether Sirius XM's misrepresentations and misconduct alleged herein violate the Oregon Unlawful Trade Practices Act, ORS 646.605 *et seq*.;

l.      Whether Sirius XM engaged in the reckless or knowing use or employment of the unlawful methods, acts or practices alleged herein which have been declared unlawful by ORS 646.608;

m.      Whether Plaintiffs and the Class have suffered ascertainable losses as a result of Sirius XM's unlawful conduct;

n.      Whether Sirius XM should be ordered to pay statutory damages of $200 to each Plaintiff and to each Class member; and

HATTIS & LUKACS
11711 SE 8th St, Ste 120
Bellevue, WA 98005
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

o.      Whether Sirius XM has violated the covenant of good faith and fair

dealing, implied in its contracts with Plaintiffs and Class members, by advertising its music plan

prices and imposing the U.S. Music Royalty Fee in the manner alleged herein.

155.    **Typicality.** Plaintiffs' claims are typical of Class members' claims. Plaintiffs and

Class members all sustained injury as a direct result of Sirius XM's standard practices and

schemes, bring the same claims, and face the same potential defenses.

156.    **Adequacy.** Plaintiffs and their counsel will fairly and adequately protect Class

members' interests. Plaintiffs have no interests antagonistic to Class members' interests and are

committed to representing the best interests of the Class members. Moreover, Plaintiffs have

retained counsel with considerable experience and success in prosecuting complex class action

and consumer protection cases.

157.    **Superiority.** A class action is superior to all other available methods for fairly

and efficiently adjudicating this controversy. Each Class member's interests are small compared

to the burden and expense required to litigate each of his or her claims individually, so it would

be impractical and would not make economic sense for Class members to seek individual redress

for Sirius XM's conduct. Individual litigation would add administrative burden on the courts,

increasing the delay and expense to all parties and to the court system. Individual litigation

would also create the potential for inconsistent or contradictory judgments regarding the same

uniform conduct. A single adjudication would create economies of scale and comprehensive

supervision by a single judge. Moreover, Plaintiffs do not anticipate any difficulties in managing

a class action trial.

**HATTIS & LUKACS**
11711 SE 8th St, Ste 120
Bellevue, WA 98005
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

158.    By its conduct and omissions alleged herein, Sirius XM has acted and refused to act on grounds that apply generally to the Class members, such that declaratory relief is appropriate respecting the Class as a whole.

159.    Sirius XM is primarily engaged in the business of selling services. Each cause of action brought by Plaintiffs against Sirius XM in this Complaint arises from and is limited to statements or conduct by Sirius XM that consist of representations of fact about Sirius XM's business operations or services that are or were made for the purpose of obtaining approval for, promoting, or securing sales of or commercial transactions in, Sirius XM's services or the statements are or were made in the course of delivering Sirius XM's services. Each cause of action brought by Plaintiffs against Sirius XM in this Complaint arises from and is limited to statements or conduct by Sirius XM for which the intended audience is an actual or potential subscriber, or a person likely to repeat the statements to, or otherwise influence, an actual or potential subscriber.

**HATTIS & LUKACS**
11711 SE 8th St, Ste 120
Bellevue, WA 98005
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

## CAUSES OF ACTION

## COUNT I

### Violation of the Unlawful Trade Practices Act
### Oregon Revised Statutes § 646.605 *et seq.*

160.     Plaintiffs Kara Kirkpatrick, Gillian Maxfield, Anna DeMarco, and Cody Michael

reallege and incorporate by reference all paragraphs previously alleged herein.

161.     Each Plaintiff brings this claim in her individual capacity and as a representative

of the Class.

162.     The Oregon Unfair Trade Practices Act (the "UTPA"), ORS 646.605 *et seq.*, is

Oregon's principal consumer protection statute. As the Supreme Court of Oregon has explained:

> **The civil action authorized by ORS 646.638 is designed to encourage private enforcement of the prescribed standards of trade and commerce in aid of the act's public policies as much as to provide relief to the injured party. This is apparent from the section itself. It allows recovery of actual damages or $200, whichever is greater, plus punitive damages, costs, and attorney fees. . . . The evident purpose is to encourage private actions when the financial injury is too small to justify the expense of an ordinary lawsuit . . . . [T]he legislature was concerned as much with devising sanctions for the prescribed standards of trade and commerce as with remedying private losses, and that such losses therefore should be viewed broadly. The private loss indeed may be so small that the common law likely would reject it as grounds for relief, yet it will support an action under the statute.**

*Weigel v. Ron Tonkin Chevrolet Co.*, 298 Or. 127, 134–36, 690 P.2d 488, 493–94 (1984).

A private plaintiff may also seek an injunction "as may be necessary to ensure cessation of

unlawful trade practices." ORS 646.636.

163.     Defendant is a "person," as defined by ORS 646.605(4).

164.     Sirius XM is engaged in "trade" and "commerce" in Oregon by advertising and

offering for sale music plans to Oregon consumers that directly or indirectly affect the people of

Oregon, as defined by ORS 646.605(8).

**HATTIS & LUKACS**
11711 SE 8th St, Ste 120
Bellevue, WA 98005
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

165.    Sirius XM's music plans are "services" that are or may be obtained primarily for personal, family or household purposes, as defined by ORS 646.605(6).

166.    Plaintiffs and Class members purchased Sirius XM's music plans for personal, family, and/or household purposes.

167.    The unlawful methods, acts and practices pled herein were committed in the course of Sirius XM's business. ORS 646.608(1).

168.    Sirius XM's unlawful methods, acts and practices pled herein were "willful violations" of ORS 646.608 because Sirius XM knew or should have known that its conduct was a violation, as defined by ORS 646.605(10).

169.    By its conduct and omissions alleged herein, Sirius XM has committed unlawful methods, acts or practices, including without limitation by:

    a.    Misrepresenting the prices of Sirius XM's music plans and concealing the true prices of its music plans;

    b.    Misrepresenting the prices of Sirius XM's music plans by advertising or quoting prices that did not include the U.S. Music Royalty Fee;

    c.    Failing to disclose or adequately disclose the existence, nature, and amount of the U.S. Music Royalty Fee when consumers signed up for Sirius XM's music plans;

    d.    Failing to ever adequately or accurately disclose the existence and nature of the U.S. Music Royalty Fee to consumers or its subscribers; and

    e.    Misrepresenting the nature of the U.S. Music Royalty Fee, including by representing or indicating that it is a government-related charge or tax, and by telling subscribers who discovered and inquired about the Fee that it is "government mandated" or is a government pass-through fee.

HATTIS & LUKACS
11711 SE 8th St, Ste 120
Bellevue, WA 98005
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

170. Sirius XM's conduct alleged herein has violated the UTPA in multiple respects, including, but not limited to, the following:

a. Sirius XM represented that its music plans had characteristics that they did not have. ORS 646.608(1)(e);

b. Sirius XM advertised its music plans with an intent not to sell them as advertised. ORS 646.608(1)(i); and

c. Sirius XM made false or misleading representations of fact concerning the offering price of its music plans. ORS 646.608(1)(s).

171. Sirius XM engaged in the reckless or knowing use or employment of the unlawful methods, acts or practices alleged herein which have been declared unlawful by ORS 646.608.

172. With respect to any omissions, Sirius XM at all relevant times had a duty to disclose the information in question because, inter alia: (a) Sirius XM had exclusive knowledge of material information that was not known to Plaintiffs and Class members; (b) Sirius XM concealed material information from Plaintiffs and Class members; and (c) Sirius XM made partial representations, including regarding the supposed price of its music plans, which were false and misleading absent the omitted information.

173. Sirius XM's misrepresentations and nondisclosures deceive and have a tendency to deceive a reasonable consumer and the general public.

174. Sirius XM's misrepresentations are material, in that a reasonable person would attach importance to the information and would be induced to act on the information in making purchase decisions.

175. As a direct, substantial, and/or proximate result of Sirius XM's unlawful conduct, Plaintiff and Class members suffered ascertainable losses and injury to business or property.

HATTIS & LUKACS
11711 SE 8th St, Ste 120
Bellevue, WA 98005
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

176.    Plaintiffs and Class members reasonably relied on Sirius XM's material misrepresentations, and would not have purchased, or would have paid less money for, Sirius XM's music plans had they known the truth.

177.    By its conduct and omissions alleged herein, Sirius XM caused the demand for its music plans to be artificially increased and caused all subscribers of those plans, including Plaintiffs and Class members, to pay premiums to Sirius XM that they otherwise would not have paid.

178.    Plaintiffs seek on behalf of themselves and for each member of the Class: (1) the greater of statutory damages of $200 or actual damages; (2) punitive damages; (3) appropriate equitable relief; and (4) attorneys' fees and costs. ORS 646.638(3); ORS 646.638(8).

179.    **Permanent injunctive relief.** The balance of the equities favors the entry of permanent injunctive relief against Sirius XM. Plaintiffs, the members of the Class, honest competing businesses, and the general public will be irreparably harmed from Sirius XM's ongoing false advertising absent the entry of permanent injunctive relief against Sirius XM.

180.    Plaintiffs lack an adequate remedy at law to prevent Sirius XM's continued unlawful practices. Plaintiffs will be harmed in the future by their inability to rely on the truthfulness and accuracy of Sirius XM's representations and advertisements regarding its music plan prices. Plaintiffs desire and intend to sign up for different Sirius XM music plans and/or to sign up for another promotional period or contract in the future. However, Plaintiffs want to be confident that the advertised and quoted price for Sirius XM's music plans is the true and full price for the plan (i.e., that it includes all applicable discretionary service charges). And, if Sirius XM introduces any new discretionary service charge, Plaintiffs want to be confident that Sirius XM will include the amount of that service charge in the advertised and quoted music plan price.

HATTIS & LUKACS
11711 SE 8th St, Ste 120
Bellevue, WA 98005
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

Plaintiffs will be harmed if, in the future, they are left to guess as to whether Sirius XM's representations are accurate and whether there are omissions of material facts regarding the music plans being advertised and represented to them.

181.    Monetary damages are not an adequate remedy at law for <u>future</u> harm. *Clark v. Eddie Bauer LLC*, No. 21-35334, 2024 WL 177755, at *3 (9th Cir. Jan. 17, 2024). Monetary damages are inadequate for future harm for the following reasons, without limitation: <u>First</u>, damages are not an adequate remedy for future harm because they will not prevent Sirius XM from continuing its unlawful conduct. <u>Second</u>, damages for future harm cannot be calculated with certainty and thus cannot be awarded. For example, it is impossible to know: (1) what music plans Plaintiffs may want or need in the future; (2) what Sirius XM's future U.S. Music Royalty Fees will be (given that the Fee is calculated as a percentage of the quoted music plan price, and given that Sirius XM has increased the percentage rate of the Fee over time); or (3) how many months Plaintiffs would continue to subscribe to Sirius XM's services. Because these factors are unknown, damages are impossible to calculate and cannot be awarded for future harm. <u>Third</u>, injunctive relief is necessary (and monetary damages do not provide a plain, adequate and complete remedy) because, without forward-looking injunctive relief enjoining the unlawful practices, the courts would be flooded with future lawsuits by the general public, Class members, and Plaintiffs for future violations of the law by Sirius XM.

182.    Plaintiffs seek public injunctive relief under the UTPA to protect the general public from Sirius XM's false advertisements, misrepresentations, and omissions. <u>Specifically, Plaintiffs seek a permanent public injunction against Sirius XM under the UTPA as follows</u>: **(1)** enjoin Sirius XM from falsely advertising the prices of its music plans to members of the general public; **(2)** enjoin Sirius XM from advertising or quoting a music plan price to members

HATTIS & LUKACS
11711 SE 8th St, Ste 120
Bellevue, WA 98005
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

of the general public if that price does not include all applicable discretionary service charges (such as the U.S. Music Royalty Fee); and **(3)** enjoin Sirius XM from representing to members of the public that the U.S. Music Royalty Fee is a "government mandated" charge, a pass-through government charge, a charge imposed to recover costs billed to Sirius XM by the government, a tax, or a charge over which Sirius XM has no control.

183.    Sirius XM's misconduct which affects the general public is ongoing in part or in whole and even if such conduct were to cease, it is behavior that is capable of repetition or re-occurrence by Sirius XM absent a permanent injunction. Accordingly, Plaintiffs seek an order enjoining Sirius XM from committing these practices which harm the general public.

184.    **Delayed Discovery Rule.** The applicable limitations period is expansive and extends back to the date on which Sirius XM first began charging the U.S. Music Royalty Fee based on the "delayed discovery" rule explicitly provided for in the UTPA. ORS 646.638(6).

185.    Plaintiffs and the Class members did not know, and could not have reasonably known, about Sirius XM's unlawful conduct. As the Oregon Supreme Court has explained, "In general terms, a cause of action does not accrue under the discovery rule until the claim has been discovered or, in the exercise of reasonable care, should have been discovered." *FDIC v. Smith* 328 Or. 420, 428, 980 P.2d 141 (1999). *See also Saenz v. Pittenger*, 78 Or. App. 207, 211–12, 715 P.2d 1126 (1986) (UTPA statute of limitations begins running when plaintiff knows or should have known of the allegedly unlawful conduct).

186.    Plaintiffs first learned of Sirius XM's deceptive pricing scheme when they saw a legal investigation webpage discussing Sirius XM's unlawful conduct, as further described above: Ms. Kirkpatrick on March 3, 2023 (¶ 79); Ms. Maxfield on July 2, 2023 (¶ 98); Ms. DeMarco on March 10, 2023 (¶ 118); and Mr. Michael on July 18, 2023 (¶ 142). Prior to reading

HATTIS & LUKACS
11711 SE 8th St, Ste 120
Bellevue, WA 98005
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

the legal investigation webpage, Plaintiffs did not know or suspect that Sirius XM was engaging in this deceptive pricing scheme.

187.    Likewise, Class members would not know or suspect that Sirius XM was engaging in this deceptive pricing scheme.

188.    Moreover, Plaintiffs and the Class could not have, with the exercise of reasonable diligence, learned of the accrual of their claims against Sirius XM at an earlier time because the nature of Sirius XM's misconduct was non-obvious and intentionally concealed, as described throughout the Complaint and reiterated below.

189.    First, none of Sirius XM's advertisements for its music plans names or mentions the existence of the U.S. Music Royalty Fee or its amount—not even in the fine print. Likewise, none of Sirius XM's advertisements states the true music plan price after adding the amount of the U.S. Music Royalty Fee. Sirius XM's sole advertising disclaimer is that "fees and taxes apply"—but in reality zero taxes and zero other fees apply, such that the undisclosed U.S. Music Royalty Fee is the one and only "fees and taxes" that is charged. Reasonable consumers understand "fees and taxes" to mean legitimate government fees and taxes. Thus, reasonable consumers who viewed Sirius XM's advertisements would not know or suspect that Sirius XM's music plans were subject to a hidden double-charge for the music plan itself in the form of the U.S. Music Royalty Fee.

190.    Second, Sirius XM does not disclose the U.S. Music Royalty Fee or its amount to subscribers when they sign up for music plans, as described in detail above at ¶¶ 35–56. At most, Sirius XM's only disclosure to consumers during the sign-up process is that unspecified "fees and taxes apply." Reasonable consumers would justifiably rely on Sirius XM's explicit representations regarding the monthly prices of its music plans, and would reasonably believe

that any extra charges would only come from legitimate government fees or taxes; thus,
reasonable consumers would have no reason to suspect that Sirius XM was actually charging
them a hidden and disguised double-charge for the music plans in the form of the U.S. Music
Royalty Fee. For example, each time Plaintiffs signed up for a music plan over the phone with
Sirius XM, the agents quoted them a specific price for the music plan that did not include the
amount of the U.S. Music Royalty Fee, and the agents never mentioned the U.S. Music Royalty
Fee; at most, Plaintiffs were told that the cost was the quoted price plus unspecified "fees and
taxes." Plaintiffs justifiably relied on Sirius XM's explicit representations regarding the monthly
prices of the music plans and had no reason to suspect that Sirius XM was actually charging
them a hidden and disguised double-charge for the music plans in the form of the U.S. Music
Royalty Fee.

191.    <u>Third</u>, Sirius XM has implemented policies and practices which prevent its
subscribers from noticing that they are being charged the Fee or from discovering its true nature.
Sirius XM signs up subscribers for automatic renewal by default. Once consumers have been
lured to sign up, Sirius XM prevents them from learning about its scheme by never thereafter
sending them monthly or ongoing billing notices or invoices. All the while, Sirius XM silently
and automatically renews their subscriptions month after month and year after year.

192.    Meanwhile, if the subscriber were to log into his or her customer account on the
Sirius XM website, the default view shows only the total amount due and does not list, let alone
explain, the U.S. Music Royalty Fee.

193.    Sirius XM also intentionally chose a name for the Fee that suggests it is a
government fee. Sirius XM calls it a "U.S." fee to falsely indicate to consumers (i.e., to those

few subscribers who learn about its existence) that it is government mandated or a government pass-through fee.

194.    <u>Fourth</u>, in the event that a subscriber happens to notice that the U.S. Music Royalty Fee has been charged and contacts Sirius XM to inquire about the Fee, Sirius XM agents outright falsely tell subscribers that the Fee is "government mandated" or is a government pass-through fee, as documented above at ¶¶ 66–68. A reasonable consumer would take Sirius XM at its word and believe that the U.S. Music Royalty Fee was a government-related fee. Thus, a reasonable consumer would not discover the true nature of the Fee or discover Sirius XM's deceptive pricing scheme even if they somehow learned of its existence (however, the vast majority of subscribers never notice the existence of the Fee at all).

## <u>COUNT II</u>

### Breach of the Implied Covenant of Good Faith and Fair Dealing

195.    Plaintiffs reallege and incorporate by reference all paragraphs previously alleged herein.

196.    Plaintiffs allege this cause of action in the alternative.

197.    To the extent any applicable contract could be read as granting Sirius XM discretion to impose the U.S. Music Royalty Fee—which Plaintiffs do not concede—that discretion is not unlimited, but rather is limited by the covenant of good faith and fair dealing implied in every contract by Oregon law.

198.    Sirius XM has violated the covenant of good faith and fair dealing by its conduct alleged herein.

199.    Sirius XM has abused any discretion it purportedly had under any applicable contract to impose the U.S. Music Royalty Fee on Plaintiffs and Class members. For example:

**HATTIS & LUKACS**
11711 SE 8th St, Ste 120
Bellevue, WA 98005
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

a.      Sirius XM imposes the U.S. Music Royalty Fee as a covert way to charge subscribers higher rates for its music plans without having to advertise such higher rates;

b.      Sirius XM does not include the amount of the U.S. Music Royalty Fee in the advertised and quoted prices for its music plans;

c.      Sirius XM fails to disclose the Fee—or to even mention the words "U.S. Music Royalty Fee"—in any Sirius XM advertising, including in the fine print;

d.      Sirius XM's sole disclaimer is that "Fees and taxes apply," but in reality zero taxes and zero other fees apply, such that the one and only purported "Fees and taxes" that is charged is the undisclosed U.S. Music Royalty Fee;

e.      None of Sirius XM's competitors charge any separate royalty fee over and above the advertised music plan price, such that Sirius XM knows that reasonable consumers would not expect Sirius XM to charge the U.S. Music Royalty Fee, let alone hide it as "Fees and Taxes";

f.      To prevent subscribers from noticing they are being charged the U.S. Music Royalty Fee, Sirius XM has a policy and practice of signing up subscribers for automatic renewal by default and never thereafter sending the subscriber any monthly or ongoing billing notices or invoices;

g.      Sirius XM put "U.S." in the beginning of the name of the U.S. Music Royalty Fee to falsely indicate to consumers that it is a government-related fee; and

h.      Sirius XM has a policy of outright falsely telling subscribers who notice and inquire about the U.S. Music Royalty Fee that it is "government mandated" or is a government pass-through fee.

200.    Sirius XM's imposition of the U.S. Music Royalty Fee defied Plaintiffs' and Class members' reasonable expectations, was objectively unreasonable, and frustrated the basic terms of the parties' agreement. Sirius XM's conduct and actions alleged herein were done in bad faith.

201.    Sirius XM's conduct described herein has had the effect, and the purpose, of denying Plaintiffs and Class members the full benefit of their bargains with Sirius XM.

202.    Plaintiffs and Class members have performed all, or substantially all, of the obligations imposed on them under any applicable agreements with Sirius XM. There is no legitimate excuse or defense for Sirius XM's conduct.

203.    Any attempts by Sirius XM to defend its overcharging through reliance on supposed contractual provisions will be without merit. Any such provisions are either inapplicable or are unenforceable because they are void, illusory, lacking in mutuality, are invalid exculpatory clauses, violate public policy, are procedurally and substantively unconscionable, and are unenforceable in light of the intentional, deceptive and hidden nature of Sirius XM's misconduct, among other reasons. Any such provisions, if any, would not excuse Sirius XM's abuses of discretion or otherwise preclude Plaintiffs and Class members from recovering for breaches of the covenant of good faith and fair dealing.

204.    Plaintiffs and Class members sustained damages as a result of Sirius XM's breaches of the covenant of good faith and fair dealing.

205.    Plaintiffs and Class members seek damages in the amount of the U.S. Music Royalty Fees paid by Plaintiffs and Class members.

HATTIS & LUKACS
11711 SE 8th St, Ste 120
Bellevue, WA 98005
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

## PRAYER FOR RELIEF

**Public Injunctive Relief:**

A. In order to prevent injury to the general public, Plaintiffs request that the Court enter a public injunction against Sirius XM under the UTPA as follows:

 1. Permanently enjoin Sirius XM from falsely advertising the prices of its music plans and from concealing the true prices of its music plans in its advertising;

 2. Permanently enjoin Sirius XM from advertising or quoting a music plan price to members of the general public if that price does not include the amount of the U.S. Music Royalty Fee;

 3. Permanently enjoin Sirius XM from advertising or quoting a music plan price to members of the general public if that price does not include all applicable discretionary service charges;

 4. Permanently enjoin Sirius XM, including Sirius XM's sales agents, from representing or stating to members of the general public that the U.S. Music Royalty Fee is any of the following: (a) a "government mandated" fee; (b) a government pass-through fee; (c) a charge imposed to recover costs billed to Sirius XM by the government; (d) a tax; or (e) a charge over which Sirius XM has no control; and

 5. Retain jurisdiction to monitor Sirius XM's compliance with the permanent public injunctive relief requested hereinabove.

**HATTIS & LUKACS**
11711 SE 8th St, Ste 120
Bellevue, WA 98005
T: 425.233.8650 | F: 425.412.7171
www.hattislaw.com

**Individual And Class Relief:**

B.     On behalf of themselves and the proposed Class, Plaintiffs request that the Court order relief and enter judgment against Sirius XM as follows:

1.     Declare this action to be a proper class action, certify the proposed Class, and appoint Plaintiffs and their counsel to represent the Class;

2.     Order that the discovery rule applies to extend any applicable limitations period and the corresponding class period for Plaintiffs and the Class to the date on which Sirius XM first began charging the U.S. Music Royalty Fee (which, based on the investigation of Plaintiffs' counsel, is 2009);

3.     Declare that Sirius XM's conduct alleged herein violates the UTPA;

4.     Order Sirius XM to pay statutory damages of $200 or actual damages, whichever is greater, to each Plaintiff and to each Class member, pursuant to, without limitation, ORS 646.638(1) and 646.638(8)(a);

5.     Order Sirius XM to pay punitive damages to Plaintiffs and the Class members in an amount to be determined at trial, pursuant to, without limitation, ORS 646.638(1) and 646.638(8)(b); and

6.     Order any other equitable relief the Court deems appropriate, pursuant to, without limitation, ORS 646.638(1), ORS 646.638(8)(c), and ORS 646.636.

**Other Relief:**

C.     On behalf of themselves and the proposed Class, Plaintiffs request that the Court order relief as follows:

1.     Order Sirius XM to pay attorneys' fees, costs, and pre-judgment and post-judgment interest to the extent allowed by law; and

CLASS ACTION COMPLAINT                            - 54 -

2.      Grant such other relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs Kara Kirkpatrick, Gillian Maxfield, Anna DeMarco, and Cody Michael demand

a trial by jury on all issues so triable.

Date: June 14, 2024.

Presented by:

HATTIS & LUKACS

By: *Che Corrington*

Che Corrington

Che Corrington, OSB No. 216151
Email: che@hattislaw.com
Daniel M. Hattis (*pro hac vice* to be submitted)
Email: dan@hattislaw.com
HATTIS & LUKACS
11711 SE 8th St, Ste 120
Bellevue, WA 98005
Telephone: (425) 233-8650

Stephen P. DeNittis (*pro hac vice* to be submitted)
Email: sdenittis@denittislaw.com
DENITTIS OSEFCHEN PRINCE, P.C.
5 Greentree Centre, Suite 410
525 Route 73 N.
Marlton, New Jersey 08057
Telephone: (856) 797-9951

*Attorneys for Plaintiffs*
*and the Proposed Class*