IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **KARA KIRKPATRICK**; **GILLIAN MAXFIELD**; **ANNA DEMARCO**; and **CODY MICHAEL**, for themselves and on behalf of all others similarly situated,<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>**SIRIUS XM RADIO LLC**,<br><br>　　　　Defendant. | Case No. 3:24-cv-955-SI<br><br>**OPINION AND ORDER** |

Che Corrington and Daniel M. Hattis, HATTIS, LUKACS & CORRINGTON, 11711 SE 8th Street, Suite 120, Bellevue, WA 98005; and Stephen P. DeNittis, DENITTIS OSEFCHEN PRINCE PC, 5 Greentree Centre, Suite 410, 525 Route 73N, Marlton, NJ 08057. Of Attorneys for Plaintiffs.

Bruce H. Cahn and Ian Maher, BALLARD SPAHR LLP, 601 SW Second Avenue, Suite 2100, Portland, OR 97204; Tim D. Wackerbarth, BALLARD SPAHR LLP, 1301 Second Avenue, Suite 2800, Seattle, WA 98101; Eric P. Stephens, JONES DAY, 250 Vessey Street, New York, NY 10281; and Jeffrey R. Johnson, JONES DAY, 51 Louisiana Avenue NW, Washington, DC 20001. Of Attorneys for Defendant.

**Michael H. Simon, District Judge.**

　　　　Plaintiffs Kara Kirkpatrick, Gillian Maxfield, Anna DeMarco, and Cody Michael bring

this putative class action under Oregon law on behalf of themselves and all others similarly

situated against Defendant Sirius XM Radio LLC ("Sirius XM"). Plaintiffs are Sirius XM

subscribers and allege that Sirius XM engaged in a deceptive pricing scheme in which it falsely advertised its music plans at lower prices than it in fact charged. Plaintiffs assert claims alleging violation of Oregon's Unlawful Trade Practices Act ("UTPA"), Oregon Revised Statutes ("ORS") § 646.605 *et seq.*, and breach of the implied covenant of good faith and fair dealing. Before the Court is Defendant's motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons described below, the Court DENIES Defendant's motion.[1]

## STANDARDS

A motion to dismiss for failure to state a claim may be granted only when there is no cognizable legal theory to support the claim or when the complaint lacks sufficient factual allegations to state a facially plausible claim for relief. *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010). In evaluating the sufficiency of a complaint's factual allegations, a court must accept as true all well-pleaded material facts alleged in the complaint and construe them in the light most favorable to the non-moving party. *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1140 (9th Cir. 2012); *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010). To be entitled to a presumption of truth, allegations in a complaint "may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). The Court must draw all reasonable inferences from the factual allegations in favor of the plaintiff. *Newcal Indus. v. Ikon Off. Sol.*, 513 F.3d 1038, 1043 n.2 (9th Cir. 2008). The Court need not, however, credit a plaintiff's legal conclusions that are couched as factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).

---

[1] Notwithstanding Sirius XM's request for oral argument, the Court does not believe that oral argument would assist in resolving the pending motion. *See* LR 7-1(d)(1).

A complaint must contain sufficient factual allegations to "plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Starr*, 652 F.3d at 1216. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Mashiri v. Epsten Grinnell & Howell*, 845 F.3d 984, 988 (9th Cir. 2017) (quotation marks omitted).

## BACKGROUND

Plaintiffs are citizens of Oregon. First Amended Complaint ("FAC"), ECF 24, ¶¶ 9-12. Defendant is a limited liability company chartered under the laws of Delaware, with its principal place of business in New York. *Id.* ¶ 13. Plaintiffs commenced this lawsuit in June 2024, and Defendant filed its Motion to Dismiss in April 2025. In support of its motion to dismiss for failure to state a claim, Defendant filed two declarations, attaching six exhibits. Defendant, however, did not argue that the Court should take judicial notice or that the Court should treat the motion to dismiss as a motion for summary judgment. Thus, Court will not consider these declarations (and the accompanying exhibits) in its analysis of the pending motion.

**A.  Sirius XM's Music Plans and Pricing System**

Defendant provides Sirius XM-branded satellite radio and internet-only streaming plans to about 33.9 million consumers nationwide, including about 431,000 Oregonians. *Id.* ¶ 18. Nearly all service plans offered by Defendant include music channels. *Id.*

Most Sirius XM subscribers use Sirius XM's services in their automobiles. *Id.* ¶ 21. Approximately 160 million vehicles operate with Sirius XM radios. *Id.* These radios are installed

in 84 percent of the new automobiles sold in the United States every year. *Id.* These new vehicles come with free trials for Sirius XM, and Sirius XM then uses marketing efforts—such as mail, email, and telemarketing calls—to convert free trial users into paying subscribers. *Id.* ¶¶ 21-23. After a subscriber is enrolled, that subscriber's music plan is automatically renewed until the subscriber affirmatively cancels. *See id.* ¶ 22.

Beginning in 2009, Sirius XM added an additional flat monthly charge, the U.S. Music Royalty Fee ("Royalty Fee"), to the price of its monthly music plan charge. *Id.* ¶ 27. In 2009, the rate was 13.9 percent; the rate is now 21.4 percent. *Id.* ¶¶ 25, 27.[2] In 2023, Sirius XM collected $1.36 billion in Royalty Fee charges, an amount greater than what Sirius XM actually paid in music royalties. *Id.* ¶ 28.[3]

Sirius XM advertises its satellite and streaming music plans through mail and email campaigns, telemarketing, internet and television advertising, and the radio. *Id.* ¶ 33. In these advertisements, Sirius XM advertises the price of its music plans without disclosing or including the Royalty Fee. *Id.* ¶ 34. In other words, its advertisements did not state the "true" price of the music plan after adding the cost of the Royalty Fee—nor do they even mention a Royalty Fee. *Id.* ¶ 35. Rather, promotional materials state in fine print, without further detail, that "[f]ees and taxes apply" to the cost of a monthly subscription. *Id.* ¶ 36; *see also id.* ¶¶ 39-40, 44. In 2023, for example, Sirius XM advertised on its website a music plan at "$5/mo. for 12 months," under which the following appears in smaller font: "Then $18.99/mo. Fees & taxes apply. See Offer Details below." *Id.* ¶ 41 (emphasis omitted). The Offer Details, however, fail to state that the

---

[2] In 2019, Sirius XM introduced its internet-based streaming-only music plan option, which charges an 8.8 percent Royalty Fee. *Id.* ¶ 26.

[3] Sirius XM automatically charged the Royalty Fee to nearly all its 431,000 Oregon subscribers, amounting to more than $17 million in annual charges. *Id.* ¶ 32.

renewal rate of $18.99 did not include the 21.4 percent Royalty Fee, bringing the monthly cost of subscription to $23.05. *Id.* ¶ 42.

Oregonians signing up for Sirius XM music plans online are not informed of the Royalty Fee until, at most, the final webpage of the online purchase process. *Id.* ¶ 47. When customers are directed to the final page of the subscription process, they can see a calculation of their monthly charges, broken down into two broad categories: the cost of the monthly plan and the aggregate cost of "fees and taxes." *Id.* All Sirius XM music plans sold in Oregon, however, charge nothing for taxes and the *only* fee ever charged in Oregon was the Royalty Fee. *Id.* ¶ 49. Oregonians subscribing to Sirius XM music plans over the telephone similarly are not informed of the added cost of the Royalty Fee. *Id.* ¶ 53.

Sirius XM uses an automatic renewal and billing process and does not send subscribers monthly or ongoing bill notices or invoices. *Id.* ¶¶ 56-57. The "only evidence" subscribers could find of their monthly charges were bank or credit card statements, which list only dollar amounts and do not mention a Royalty Fee. ¶ 58. Sirius XM's customer service would tell subscribers asking about the Royalty Fee that the Royalty Fee was "government mandated" or a "government pass-through fee." *Id.* ¶ 62; *see also id.* ¶ 63 (providing example of interaction with customer service). Sirius XM's website states that the Royalty Fee is "required by law." *Id.* ¶ 64.

**B. Individual Plaintiffs**

Kirkpatrick is a citizen and resident of Portland, Oregon. *Id.* ¶ 67. In 2021, Kirkpatrick inherited her parents' car, which was equipped with a Sirius XM radio. *Id.* ¶ 68. Kirkpatrick called Sirius XM to learn about its music plans and pricing. *Id.* ¶ 69. The agent quoted her a price of $21.99 per month, which did not include the Royalty Fee; nor did the agent mention the Royalty Fee over the telephone. *Id.* Relying on what the agent said, Kirkpatrick gave her credit card information to the agent and purchased a music plan subscription. *Id.* ¶ 70. Every month,

Sirius XM "silently and automatically" charged Kirkpatrick's credit card and "inundated" her inbox with dozens of marketing emails. *Id.* ¶¶ 71-72.

Maxfield is a citizen and resident of Portland, Oregon. *Id.* ¶ 86. In 2014, she purchased a new car and received a one-year free trial subscription to Sirius XM's "All Access" music plan if she provided her credit card information, which she did. *Id.* ¶ 87. After one year, Maxfield subscribed to a six-month plan at a promotional price and continued to do so through 2021. *Id.* ¶¶ 88, 91. Every six months, however, Sirius XM would charge her for the regular price—instead of the promotional price—and she would have to call a Sirius XM agent to credit her account for the difference. *Id.* ¶¶ 88-91. In every instance, the quoted price did not include the Royalty Fee, nor did the agent mention the Royalty Fee. *Id.* ¶ 91.

DeMarco is a citizen and resident of Marcola, Oregon. *Id.* ¶ 107. In 2015, she purchased a new car that came with a two-month free trial subscription to Sirius XM "All Access" plan. *Id.* ¶ 108. After the trial ended, DeMarco called Sirius XM and learned that she could purchase a music plan at a monthly cost of $19.99. *Id.* ¶ 109. The quoted price did not include the Royalty Fee, nor did the agent mention the Royalty Fee. *Id.* In February 2022, DeMarco cancelled her subscription; she called Sirius XM again in about September to discuss purchasing a new plan, which she ultimately did. *Id.* ¶¶ 113-15. Again, the agent did not inform her of the Royalty Fee. *Id.* ¶ 114. DeMarco remains a subscriber as of March 3, 2025. *Id.* ¶ 119.

Michael is a citizen and resident of Salem, Oregon. *Id.* ¶ 129. He purchased a used car in 2020 that came with a free trial subscription to Sirius XM. *Id.* ¶ 130. He did not use the free trial. *Id.* In 2022, Michael decided to learn more about Sirius XM's music plans by visiting its website. *Id.* ¶ 131-32. Michael saw an advertisement for a promotional plan at $29.94 for a six-month period, which he selected. *Id.* ¶ 132. Throughout the subscription purchasing process,

none of the webpages disclosed the added Royalty Fee. *Id.* ¶¶ 133-34. Instead, on the order submission page, Sirius XM stated that it would charge Michael $29.94 for a six-month plan, plus unspecified "Fees and Taxes." *Id.* ¶ 134. Michael completed the purchase. *Id.* ¶ 135. Three months later, when it appeared that his original order not "gone through," Michael repeated the online subscription process and purchased a different plan. *Id.* ¶ 138-39. Again, he was not made aware of the Royalty Fee at any time during the purchasing process. *Id.* ¶¶ 140, 143. Michael cancelled his subscription in December 2022. *Id.* ¶ 145. Each of these four named Plaintiffs were unaware that the Royalty Fee existed at the time of their subscription or in subsequent billing periods. Plaintiffs only learned about the Royalty Fee when they saw various "legal investigation advertisements" online. *See id.* ¶¶ 79, 100, 122, 150.[4]

Plaintiffs bring a putative class action on behalf of "all others similarly situated," presumably including Oregon subscribers to Sirius XM's services. They seek injunctive relief enjoining Sirius XM from false or misleading advertisement or representation with respect to the Royalty Fee. They also seek equitable relief, including statutory and punitive damages, as well as attorney's fees, costs, and interest. Defendant moves to dismiss with prejudice Plaintiffs' complaint in its entirety.

## DISCUSSION

Defendant moves to dismiss Plaintiffs' UTPA claim both as untimely and on the merits. Additionally, Defendant challenges Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing, which Plaintiffs alleged in the alternative, arguing that express contractual terms cannot violate the covenant. Finally, Defendant argues that Plaintiffs' request for

---

[4] After discovering the Royalty Fee, Plaintiffs attempted to arbitrate their disputes with Sirius XM through separate demands for arbitration made to the American Arbitration Association ("AAA"), but the AAA administratively closed these cases after Sirius XM failed to pay the required arbitration fees. FAC ¶¶ 80-85, 101-06, 123-28, 151-56.

PAGE 7 – OPINION AND ORDER

injunctive relief is moot because Defendant voluntarily has changed its policy and now adequately discloses the Royalty Fee. The Court addresses each argument in turn.

## A. Violation of UTPA

Plaintiffs allege that Sirius XM willfully violated ORS § 646.605. Specifically, Plaintiffs allege that Sirius XM: (1) represented that its music plans had characteristics that it did not, in violation of ORS § 646.608(1)(e); (2) advertised its music plans with an intent not to sell them as advertised, in violation of ORS § 646.608(1)(i); and (3) made false or misleading representations of fact concerning the offering price of its music plans, in violation of ORS § 646.608(1)(s). Sirius XM moves to dismiss this claim on two grounds. First, Sirius XM argues that Plaintiffs' claim is untimely. Second, Sirius XM argues that it did not deceive or mislead Plaintiffs because it disclosed to them the full and final price of a subscription before they agreed to enroll.

### 1. Timeliness

The UTPA requires that for a claim to be timely it must "be commenced within one year after the discovery of the unlawful method, act or practice." ORS § 646.638(6). Under Oregon's discovery rule, "a cause of action does not accrue . . . until the claim has been discovered or, in the exercise of reasonable care, should have been discovered." *FDIC v. Smith*, 328 Or. 420, 428 (1999); *see also T.R. v. Boy Scouts of Am.*, 344 Or. 282, 292 (2008) (en banc); *Gaston v. Parsons*, 318 Or. 247, 256 (1994). "[A] plaintiff must have a reasonable opportunity to become aware of the following three elements before the statute of limitations will begin to run: (1) harm; (2) causation; and (3) tortious conduct." *Smith*, 328 Or. at 428. "The discovery rule applies an objective standard—how a reasonable person of ordinary prudence would have acted in the same or similar situation." *Kaseberg v. Davis Wright Tremaine, LLP*, 351 Or. 270, 278 (2011); *see also MacQuaid v. N.Y. Times Co.*, 2023 WL 2633359, at *1 (D. Or. Mar. 24, 2016). "Application of the discovery rule presents a factual question for determination by a jury unless

the only conclusion that a jury could reach is that the plaintiff knew or should have known the critical facts at a specified time and did not file suit within the requisite time thereafter." *Kaseberg*, 351 Or. at 278.

Consistent with the well-pleaded complaint rule, the Court first looks to the facts as Plaintiff alleges them to apply the discovery rule. *See Egbukichi v. Wells Fargo Bank, NA*, 184 F. Supp. 3d 971, 977-78 (D. Or. 2016) (granting a defendant's motion to dismiss in part because the plaintiffs did not allege "facts sufficient to support application of the discovery rule"). To those facts, the Court then applies "a two-step analysis to determine whether [the] plaintiff should have known of the alleged misrepresentations." *McCulloch v. Price Waterhouse LLP*, 157 Or. App. 237, 248 (1998); *see also Mathies v. Hoeck*, 284 Or. 539, 542-43 (1978).

First, the plaintiff must have "sufficient knowledge to 'excite attention and put a party upon his guard or call for an inquiry.'" *Mathies*, 284 Or. at 543 (quoting *Linebaugh v. Portland Mortgage Co.*, 116 Or. 1, 14 (1925) (cleaned up)). Second, it must be clear that "an investigation that a reasonable person in his or her circumstances would conduct . . . . would have disclosed the necessary facts." *See T.R.*, 344 Or. at 292-93. The Court thus looks to the Complaint to evaluate whether Plaintiffs' claims here are timely, keeping in mind that the discovery rule generally presents a factual issue for the jury unless the *only* conclusion that a reasonable jury could reach from the facts alleged is that Plaintiffs knew or should have known the critical facts regarding the elements of Plaintiffs' UTPA claim. *See Kaseberg*, 351 Or. at 278.

### a. Plaintiffs Kirkpatrick, Maxfield, and DeMarco

Three of the named Plaintiffs—Kara Kirkpatrick, Gillian Maxfield, and Anna DeMarco—purchased their Sirius XM subscriptions over the telephone. Though the specific details of those telephone conversations differ, all three allege that the Sirius XM agents with whom they spoke quoted a subscription base price but never mentioned the Royalty Fee or any

other information that might have cued them to ask about the Royalty Fee.[5] Plaintiffs also argue that Sirius XM automatically billed Plaintiffs and so provided no invoices or statements. Defendant does not dispute these allegations. It responds that, well more than a year before filing suit, Plaintiffs received sufficient knowledge to "excite attention" because the full charge, inclusive of the Royalty Fee, would have appeared on Plaintiffs' credit card statements and was reflected in their respective Sirius XM online accounts.

As noted, "[a]pplication of the discovery accrual rule is a factual issue for the jury unless the only conclusion a reasonable jury could reach is that the plaintiff knew or should have known the critical facts at a specified time and did not file suit within the requisite time thereafter." *T.R.*, 344 Or. at 296. That is a high standard, and it is not met here, at least at the pleading stage of the lawsuit. Although a reasonable jury could find that the credit card charges and Sirius XM online accounts were sufficient to put Plaintiffs on notice, that is not the *only* conclusion that a reasonable jury could reach. *See id.* at 297 (rejecting application of the discovery rule as supporting a motion for directed verdict after a jury trial in part because although "a reasonable jury *could* have reached that conclusion, we do not agree that that was the *only* conclusion a reasonable jury could have reached" (emphases in original)). A reasonable jury also could find that a plaintiff, faced with the above facts and absent a clearly stated notice from Sirius XM,

---

[5] The Court notes Plaintiffs' allegation that Sirius XM quoted Ms. Kirkpatrick a price of "$21.99 a month *plus*." FAC 24 ¶ 69. Such language suggests that at least one of the named Plaintiffs might have had *some* knowledge sufficient to alert her to the Royalty Fee or trigger the duty to investigate further. The Court does not foreclose the possibility of summary judgment if undisputed evidence exists to confirm such knowledge. At this stage, however, based on this allegation alone, the Court cannot determine that the *only* conclusion a reasonable jury could reach is that Ms. Kirkpatrick was on notice of the Royalty Fee or had a duty to investigate further such that with a reasonable inquiry at the time she would have discovered the Royalty Fee. *See, e.g.*, *T.R.*, 344 Or. at 292-93 (explaining the requirements of the duty to investigate under Oregon's discovery rule).

might reasonably miss such a small additional charge in the cacophony of everyday life. The Court is hesitant, especially at the pleading stage, to dismiss Plaintiffs' UTPA claim on this basis. Thus, with respect to Plaintiffs Kirkpatrick, Maxfield, and DeMarco, the Court denies Defendant's motion to dismiss on timeliness grounds.

### b. Plaintiff Michael

Unlike the other three named Plaintiffs, Mr. Michael enrolled in a Sirius XM subscription online. He acknowledges that upon checking out, he viewed a page that stated that he would be charged $10.99 plus fees and taxes. That warning would have put a reasonable person "upon his guard" that his purchase might be subject to additional fees and taxes and should have prompted Mr. Michael to inquire further. *See MacQuaid*, 2023 WL 2633359, at *1 (holding that a checkout page that contained language indicating additional information about payment terms was sufficient to put a plaintiff on notice to investigate). Therefore, step one is satisfied.

As for step two, Mr. Michael includes in his Complaint a screenshot of the checkout page that he viewed when purchasing his Sirius XM subscription. FAC ¶ 47. The page shows both a line item for the base subscription and a line item for additional fees and taxes, as well as an "all-in" cost. It does not break out separately taxes and fees, nor does it specify precisely what taxes and fees are included. It does, however, provide a link to "details" about those taxes and fees. Additionally, it also includes a link to the Customer Agreement, which Defendant claims disclosed the Royalty Fee and in turn linked to an informational page that included the amount of the Royalty Fee.

"Ordinarily, affirmative defenses . . . may not be raised on a motion to dismiss except when the defense raises no disputed issues of fact." *Lusnak v. Bank of Am., N.A.*, 883 F.3d 1185, 1194 n.6 (9th Cir. 2018). Courts can "consider an affirmative defense on a motion to dismiss when there is some obvious bar to securing relief on the face of the complaint." *U.S. Commodity*

PAGE 11 – OPINION AND ORDER

*Futures Trading Comm'n v. Monex Credit Co.*, 931 F.3d 966, 973 (9th Cir. 2019) (quotation marks omitted). "In other words, dismissal based on an affirmative defense is permitted when *the complaint* establishes the defense." *Id.* (emphasis in original).

The facts alleged by Mr. Michael do not by themselves meet the second step of the timeliness analysis because a reasonable jury could find that a "reasonably diligent inquiry" would still not have revealed the factual basis of Mr. Michael's UTPA claim. *See Loewen v. Galligan*, 130 Or. App. 222, 238 (1994) ("The only conclusion that reasonably can be drawn from the evidence in the summary judgment record is that plaintiffs discovered or should have discovered, through reasonably diligent inquiry, the facts on which this action is based no later than [a date more than two years from the filing of the complaint]"). There is nothing *in the FAC* to confirm what Mr. Michael might have seen had he clicked on the "details" link. The screenshot of the checkout page shows that links to the Customer Agreement were small and hidden in fine print. Additionally, the links appeared in sentences asking customers to agree to receive email notifications and informing them about refund and cancellation policies, not in the context of informing customers about fees and taxes. Thus, a reasonable consumer interested in learning more about fees and taxes might not have noticed or thought to click on them.

Further, even if the advertised all-in price and listed "taxes and fees" had prompted Mr. Michael to call Sirius XM for clarification, Plaintiffs allege that Sirius XM telephone agents failed accurately to inform Ms. Kirkpatrick, Ms. Maxfield, and Ms. DeMarco about the Royalty Fee. This allows a reasonable inference in favor of Mr. Michael as this stage of the litigation to conclude that Sirius XM similarly would have failed accurately to inform Mr. Michael had he called Defendant. Thus, a reasonable jury might find that a reasonably diligent inquiry would have failed to uncover the facts underlying Mr. Michael's UTPA claim, and the second step of

the timeliness analysis is not satisfied. The Court therefore denies Defendant's motion to dismiss Mr. Michael's complaint on ground of timeliness.

### 2. Merits

Defendant argues that Plaintiffs' claims should be dismissed on the merits for three reasons. Defendant first argues that the UTPA employs a "reasonable consumer" standard in this context. Defendant cites *Vitort v. Kroger Co.*, 2023 WL 3143690 (9th Cir. 2023), which is an *unpublished* decision from the Ninth Circuit and has no precedential value. *See* Ninth Circuit Rule 36-3. Defendant uses that case to support the contention that, when both parties *agree* to a reasonable person standard, that is the standard applied to a UTPA claim. In *Vitort*, the parties argued that the Ninth Circuit should apply California's articulation of the reasonable consumer test to the pending case under Oregon's UTPA. *Id.* at *1 n. 2. The Ninth Circuit noted that "[w]hile the Oregon Supreme Court has suggested that a reasonable consumer test applies to [Oregon] UTPA claims, it has not held so directly." *Id.* (citing *Pearson v. Philip Morris, Inc.*, 358 Or. 88, 135 n. 26 (2015)). Because the parties in *Vitort* agreed, however, the Ninth Circuit "assume[d] without deciding that our prior cases analyzing California's reasonable consumer test provide guidance for analyzing Vitort's Oregon state law claims." *Id.*

Here, even if this Court were to follow the *Vitort* approach, it is not established that Plaintiffs have "agreed" to a reasonable person standard. Plaintiffs appear to use a reasonable person standard in their FAC, *see* FAC ¶¶ 4, 30, 51-52, but their predominant use of that standard relates to the timeliness question, not the merits question, *see* FAC ¶¶ 160-63, 170-71, 204, 207; ECF 31 at 10-11, 16-20. Although Defendant contends that Plaintiffs "concede" that the reasonable person standard applies to the UTPA, citing FAC ¶ 173(h), Plaintiffs' cited allegation relates to *materiality*. Under Oregon law, the standard for materiality for an omission or misrepresentation is a that of a reasonable person. *See, e.g.*, *Millikin v. Green*, 283 Or. 283,

285 (1978); *cf. Loewen*, 130 Or. App. at 242 (holding that materiality is an objective question that can be answered as a matter of law only when reasonable persons could not differ).[6] Moreover, Plaintiffs explicitly argue that Oregon law requires the application of a "least sophisticated consumer" standard. ECF 31 at 23 n. 10 (citing *Clark v. Eddie Bauer LLC*, 371 Or. 177, 186 (2023) ("[T]he function of the [UTPA] should be to protect society, including protecting gullible people from themselves." (quotations omitted)). Thus, the standard under Oregon's UTPA is, at best, unclear. The Court need not decide at this time which standard to apply, however, because Defendant cannot prevail on its motion to dismiss even under the more stringent standard, as discussed next.

Second, Defendant argues that no reasonable consumer "would care to (or is entitled to) know anything more" than the "all-in" price of Defendant's products, and so that was all Defendant needed to provide to avoid misleading Plaintiffs. In support, Defendant cites *Wayne v. Staples, Inc.*, 135 Cal. App. 4th 466 (Cal. App. 2006), a non-binding case from the appellate court of a different state applying California law. But the Oregon Supreme Court has more broadly defined what types of misrepresentations will support a claim under the UTPA and what a plaintiff must prove for such a claim. In *State ex rel. Rosenblum v. Living Essentials, LLC*, the court explicitly rejected that under ORS § 646.608(1)(b) and (1)(e), a defendant's alleged misconduct "is actionable only if it is 'material to consumer purchasing decisions.'" 371 Or. 23, 38 (2023) (quoting O.R.S. § 646.608(1)(b)) ("The proposition that the only statements *capable* of misleading are those that are material to the purchasing decision are not correct." (emphasis in original)); *see also id.* at 44 ("In this case, the text, context, and legislative history demonstrate

---

[6] As discussed below, the Oregon Supreme Court has held that a plaintiff is not required to show materiality in a claim under Oregon's UTPA. *See State ex rel. Rosenblum v. Living Essentials, LLC*, 371 Or. 23, 38 (2023).

that the statute unambiguously does not require proof that a defendant's conduct was material to consumer purchasing decisions." (quotation omitted)). Going one step further, the court explained that the state legislature meant to bar a range of conduct that tended to confuse or mislead customers, even if that conduct did not materially influence purchasing decisions, and so the statute "prohibits certain representations without regard to materiality." *Id*. at 41; *see also Searcy v. Bend Garage Co.*, 286 Or. 11, 16-17 (1979) (en banc). Applying that principle to this case, it does not matter what a reasonable customer needed to or was entitled to know to make a given purchase.[7] What matters is whether a business's conduct violates the enumerated provisions of the statute. This argument by Defendant therefore fails.

Finally, Defendant argues that it provided the all-in price to Plaintiffs and thus Plaintiffs lack any cognizable legal theory to support their claim and lack sufficient factual allegations to state a claim for relief. On this argument, the only named Plaintiff who signed up for Sirius XM online—Mr. Michael—must be analyzed separately from those who signed up by telephone—Ms. Kirkpatrick, Ms. Maxfield, and Ms. Demarco. As previously discussed, Mr. Michael viewed the all-in price of his subscription on the online checkout page before completing his purchase. Defendant's argument that it informed Mr. Michael of the all-in price therefore appears to be correct, but immaterial under the Court's above rejection of the argument that the all-in price is all the Defendant was required to provide under the UTPA.

Defendant also argues that Plaintiffs Kirkpatrick, Maxfield, and DeMarco were informed of the all-in price of their Sirius XM subscription through the Customer Agreement. But, as

---

[7] *Living Essentials* dealt only with subsections (b) and (e) of ORS § 646.608(1). 371 Or. at 37-38. In this case, the Plaintiffs allege violations of (e), (i), and (s). The *Living Essentials* court declined to read a materiality requirement into (b) and (e) because the plain text of the statute did not create one. *Id*. Similarly, there is no materiality requirement in the plain text of (i) and (s), and so the logic of *Living Essentials* would appear to apply.

discussed above, all three Plaintiffs allege that they were not informed of the all-in price *or* the Royalty Fee on the telephone before completing their purchase. Moreover, they were sent the Customer Agreement only after they completed their purchase on the telephone. "It is well-established that questions of fact cannot be resolved or determined on a motion to dismiss for failure to state a claim upon which relief can be granted." *Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv. Inc.*, 911 F.2d 242, 245 (9th Cir. 1990). The parties' disagreement over whether Plaintiffs were informed of the cost of their subscription is a matter that must be resolved in favor of the Plaintiffs at this stage of the lawsuit. Thus, the Court denies Defendant's motion to dismiss on the merits the UTPA claim alleged by Plaintiffs Kirkpatrick, Maxfield, and DeMarco.

**B. Breach of Implied Covenant of Good Faith and Fair Dealing**

If an applicable contract can reasonably be read as granting Sirius XM discretion to impose the Royalty Fee, Plaintiffs allege that this discretion is limited by the covenant of good faith and fair dealing. "The law imposes a duty of good faith and fair dealing in the performance and enforcement of every contract." *Hampton Tree Farms, Inc. v. Jewett*, 320 Or. 599, 615 (1995). Defendant primarily argues that it has an "express, written contractual right" to charge the Royalty Fee, and thus the exercise of that right is *per se* not a violation of the implied covenant of good faith and fair dealing. *See Uptown Heights Assocs. Ltd. P'ship v. Seafirst Corp.*, 320 Or. 638, 645 (1995). Plaintiffs respond that Defendant had contractual discretion to set fees, but that the covenant required Defendant to exercise that discretion "within the confines of the reasonable expectations" of consumers. *Best v. U.S. Nat'l Bank of Or.*, 303 Or. 557, 564 (1987); *see also, e.g.*, *Uptown Heights*, 320 Or. at 646-47 (rejecting the application of *Best* where there is a specific contractual agreement as to a contested term but reaffirming its application to situations where companies have contractual discretion); *Pac. First Bank v. New Morgan Park Corp.*, 319 Or. 342, 353-55 (1994) (affirming the principles of *Best*).

PAGE 16 – OPINION AND ORDER

In *Best*, the Oregon Supreme Court stated that the bank had the contractual right to charge fees to depositors. *See* 303 Or. at 564. The court also noted, however, the bank's practices of charging nonsufficient fund ("NSF") fees that were well above its actual costs, as well as those it charged for other services, and not discussing NSF rates with customers but instead simply notifying customers through a vague reference in the account agreement. *Id*. at 564-65. Considering these facts, the Oregon Supreme Court held that there was a genuine issue of material fact as to whether the bank had carried out its contractual rights in bad faith because the rates were so much higher than customers' reasonable expectations. *Id*. at 565-66. Similarly in this case, Plaintiffs has adequately alleged, in the alternative, that the way in which Sirius XM informed Plaintiffs of the Royalty Fee rendered it outside the confines of Plaintiffs' reasonable expectations. At this stage of the proceeding, that is sufficient.

Additionally, at this stage, with respect to Plaintiffs Kirkpatrick, Maxfield, and DeMaro, it is not even clear what constitutes the contract at issue in this case. Plaintiffs appear to allege that their telephone conversations with Sirius XM agents constituted oral contracts—contracts that did not include the Royalty Fee, while Defendant insists that the written Customer Agreement is the controlling contract. At this stage of the lawsuit, the Court accepts Plaintiffs' well pleaded allegations as true. Accepting the oral agreements made over the telephone as the operative agreement, Defendant's contractual justification for its conduct vanishes. Thus, the Court denies Defendant's motion to dismiss Plaintiffs' claim of breach of the Implied Covenant of Good Faith and Fair Dealing.

**C. Mootness**

Finally, Defendant argues that Plaintiffs' request for injunctive relief should be denied as moot because Defendant has changed its advertising practices with respect to the Royalty Fee, now including "all-in pricing" on all advertisements to conform with a new California law. Not

only does this argument ignore the full breadth of Plaintiffs' claims against Defendant, it ignores the law of mootness. "[A] defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Env. Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000). Here, Defendant only has voluntarily changed its advertising practices. There is little to stop it from changing those practices again, either generally or specifically with respect to customers in Oregon. *See id.* at 189 ("It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice. If it did, the courts would be compelled to leave the defendant free to return to his old ways." (cleaned up)); *see also Rosebrock v. Mathis*, 745 F.3d 963, 972 (9th Cir. 2014) (stating that courts "are less inclined to find mootness where the new policy could be easily abandoned or altered in the future" (cleaned up)). Therefore, Defendant has not met the high burden under the voluntary cessation doctrine, and the Court denies its motion to dismiss on grounds of mootness.

## CONCLUSION

For the reasons stated in this Opinion and Order, the Court DENIES Defendant's Motion to Dismiss (ECF 25).

**IT IS SO ORDERED**.

DATED this 14th day of October, 2025.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge